# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEVRY EDUCATION GROUP, INC., DEVRY UNIVERSITY, INC., and DEVRY/NEW YORK, INC., <br><br> Plaintiffs and Counter-Defendants, <br><br> v. <br><br> T'LANI ROBINSON and ROBBY BROWN, Individually and on Behalf of All Others Similarly Situated, <br><br> Defendants and Counter-Claimants. | Case No.: 1:16-cv-07447 <br><br> <u>CLASS ACTION</u> <br><br> **ANSWER AND COUNTERCLAIM FOR:** <br><br> **(1) VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS 510,** *et seq.***;** <br> **(2) VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505,** *et seq.***;** <br> **(3) VIOLATION OF THE ILLINOIS PRIVATE BUSINESS AND VOCATIONAL SCHOOLS ACT, 105 ILCS 425/1,** *et seq.***;** <br> **(4) BREACH OF CONTRACT;** <br> **(5) MISREPRESENTATION;** <br> **(6) CONCEALMENT;** <br> **(7) NEGLIGENCE;** <br> **(8) CONVERSION;** <br> **(9) UNJUST ENRICHMENT; AND** <br> **(10) DECLARATORY RELIEF.** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## DEFENDANTS' ANSWER AND COUNTERCLAIM

Defendants T'Lani Robinson ("Robinson) and Robby Brown ("Brown") (individually Robinson and Brown may be referred to herein as "Defendant" or "Counter-Claimant" and collectively as "Defendants" or "Counter-Claimants") answer and counterclaim as follows.

- 1 -

Each answer and affirmative defense is limited to, and provided only for the purpose of, answering the Plaintiff's Complaint, and is not necessarily applicable to the allegations of Defendant's Counterclaim.

## ANSWER

1.  ¶ 1.  Admit.

2.  ¶ 2.  Admit, except deny that the relationship of the parties is subject to an agreement to arbitrate.  Defendants further state that since the date Defendants originally filed their arbitration claim, Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated.

3.  ¶ 3.  Admit Defendants' relationship with Plaintiff DVU is governed in part by an enrollment agreement, except deny that the relationship between the parties is governed exclusively and wholly by the enrollment agreement, and further state Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated.  Deny knowledge or information sufficient to form a belief as to the truth of whether each Defendants' relationship with Plaintiffs DVG and DVNY is governed in part by an enrollment agreement. Deny knowledge or information sufficient to form a belief as to the truth of whether each Defendant's signature on the enrollment agreements attached to the Complaint as Exhibits C and D, respectively, is valid and enforceable.  Defendants further state the allegations and statements in ¶ 3 call for a conclusion of law, to which no response is required.

4.  ¶ 4.  Admit Plaintiffs request the Court issue two declarations.  Admit Plaintiffs ask this Court to declare that the Court, not the arbitrator, is to decide whether class arbitration is

available pursuant to the Agreements. Admit Plaintiffs ask this Court to declare that the Agreements do not authorize class-wide arbitration. Deny that the relationship of the parties is subject to an agreement to arbitrate, and further state that Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated.

5.     ¶ 5. Admit Plaintiffs request a declaration that the issue of whether a contract permits class arbitration is a gateway question of arbitrability to be decided by the court. Deny that the issue of whether a contract permits class arbitration is a gateway question of arbitrability to be decided by the court. Deny the arbitration agreement provides no clear and unmistakable language directing that the question of class arbitrability be submitted to an arbitrator. Deny that the question is properly determined by a court. Deny that the relationship of the parties is subject to an agreement to arbitrate. Defendants further state that Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated. Defendants further state the allegations and statements in ¶ 5 call for a conclusion of law, to which no response is required.

6.     ¶ 6. Deny the arbitration provisions in the Agreements upon which Defendants base their Demand, by their plain terms, do not authorize arbitration on a class basis. Deny the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the "FAA") applies to the Agreements. Deny the FAA bars Defendants from seeking to advance class arbitration. Deny an arbitrator lacks power to conduct such an arbitration. Defendants further state that the relationship of the parties is not subject to an agreement to arbitrate because Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury

and certification as a class action lawsuit on behalf of all persons similarly situated. Defendants further state the allegations and statements in ¶ 6 call for a conclusion of law, to which no response is required.

7.  ¶ 7. Admit Plaintiff DVU is a subsidiary of DVG and incorporated in Delaware and further state DVU's principal place of business is in Illinois. Defendants deny knowledge or information sufficient to form a belief as to the truth of whether Plaintiff DVU is an accredited institution of higher learning, offering a variety of degree programs at the graduate and undergraduate level. Defendants further state they deny knowledge or information sufficient to form a belief as to what Plaintiffs mean by "accredited." Defendants deny knowledge or information sufficient to form a belief as to the truth of whether DVU offers career-oriented education, with classes held year-round on campus and online, during the day, at night, and on weekends.

8.  ¶ 8. Admit.

9.  ¶ 9. Admit.

10.  ¶ 10. Admit T'Lani Robison is a resident of the state of Georgia and attended DVU at the Decatur, Georgia campus. Deny Defendant Robinson's attendance was for only one session in 2013. Defendants further state they deny knowledge or information sufficient to form a belief as to what Plaintiffs mean by "session."

11.  ¶ 11. Admit Defendant Robby Brown is a resident of the state of Missouri and attended DVU at a Kansas City, Missouri campus. Defendants further state that Defendant Robby Brown attended two different DVU campuses in the Kansas City, Missouri, and/or Kansas City, Kansas campuses. Deny Defendant Brown's attendance was for three sessions in 2010 and 2011.

Defendants further state they deny knowledge or information sufficient to form a belief as to what Plaintiffs mean by "session."

12.  ¶ 12. Admit this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a), based on the diversity of citizenship of the parties, except further state they deny knowledge or information sufficient to form a belief as to whether members of any putative class in this action are of diverse citizenship to Plaintiffs. Admit the amount in controversy, exclusive of costs and interests, exceeds $75,000.

13.  ¶ 13. Deny for purposes of answering the Complaint that this Court has personal jurisdiction over Defendants in answering the Complaint. Defendants further state they deny knowledge or information sufficient to form a belief as to whether, *inter alia*, Defendants have initiated an arbitration related to their alleged interests in this District

14.  ¶ 14. Deny for purposes of answer the Complaint that venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2). Defendants further state they deny knowledge or information sufficient to form a belief as to what Plaintiffs' mean by "activities" and therefore whether the activities giving rise to this declaratory action occurred in this District.

15.  ¶ 15. Admit.

16.  ¶ 16. Defendants state they deny knowledge or information sufficient to form a belief as to whether Plaintiffs received formal notice of Defendants' Demand from the American Arbitration Association on June 23, 2016.

17.  ¶ 17. Defendants state they deny knowledge or information sufficient to form a belief as to what Plaintiffs mean by "relates to advertising and other representations made by Plaintiffs regarding graduate employment rates and relative earnings of DVU graduates." Defendants state they deny knowledge or information sufficient to form a belief as to what

Plaintiffs mean by "The Demand alleges generally that Plaintiffs made deceptive and misleading representations about the benefits of a DVU education."

18.     ¶ 18. Admit the Claim[1] asserts six causes of action for breach of contract, negligence, violation of the Illinois Uniform Deceptive Trade Practices Act, conversion, unjust enrichment, and seeks a declaratory judgment. Deny Defendants' six causes of action are "Based on the allegations described in ¶ 17. Defendants further state the Claim speaks for itself regarding what the six causes of action are "Based on."

19.     ¶ 19. Admit Defendants purport to have filed the Demand and to have brought the Arbitration on behalf of themselves and a putative class of others who, in part, "(a) entered into an enrollment agreement substantially in accordance with the terms and conditions of the Agreement . . . and (b) purchased or otherwise paid for and received a DVU Education, from January 1, 2008 until April 8, 2016." Deny ¶ 19 is a complete description of the putative class or its members. Defendants further state the Claim speaks for itself regarding the definition of the putative Class.

20.     ¶ 20. Admit Plaintiffs deny the allegations in the Demand.

21.     ¶ 21. Admit before enrolling in DVU, each Defendant individually signed an "Enrollment Agreement," which is required of all DVU students. Defendants state they deny knowledge or information sufficient to form a belief as to whether each of "These Agreements contain an arbitration clause, covering all controversies, between the student and DVU relating to the agreement or the education provided by DVU," and that the allegations and statements in ¶ 21 call for a conclusion of law to which no response is required. Deny that the arbitration clause covers all controversies, and/or is limited to covering only controversies between the student and DVU.

---

[1] Defendants note it is their Claim, and not the Demand, that assert six causes of action and a typographical error in the numbering of such causes of action on the caption of the Claim.

22. ¶ 22. Admit the Agreements state, "The intent of this Agreement is 'to make clear the educational services to which you are entitled as a student of DeVry."

23. ¶ 23. Defendants state they deny knowledge or information sufficient to form a belief as to what Plaintiffs mean by "The agreement signed by Defendant Robinson is substantially the same as the Agreement signed by Defendant Brown." Admit Defendant Robinson signed an Agreement on May 8, 2013, which states:

> "Any claim or controversy arising out of or related to the terms of this Agreement or the education provided by DeVry, regardless of form or cause of action shall be decided and determined by binding arbitration under the commercial arbitration rules of the American Arbitration Associates [sic]. The parties acknowledge and agree that this agreement involves interstate commerce and that the Federal Arbitration Act will govern the enforceability of this provision."

24. ¶ 24. Admit Defendant Brown signed an Agreement dated May 21, 2010, which states:

> "Any claim or controversy arising out of or relating to the terms of this Agreement or the education provided by DeVry, regardless of form or cause of action shall be decided and determined by binding arbitration under the commercial arbitration rules of the American Arbitration Association. The parties acknowledge and agree that this agreement involves interstate commerce and the Federal Arbitration Act will govern the enforceability of this provision."

25. ¶ 25. Deny that the provisions in the Agreement signed by Defendant Robinson and Defendant Brown make no reference to class arbitration. Admit Defendants sought to arbitrate their disputes with DeVry on a representative, class-wide basis, seeking to represent all students who "purchased or otherwise paid for an education and related educational products and services sold by DeVry (the 'Education') between January 1, 2008 and April 8, 2016, both dates inclusive (the 'Class Period')," except Defendants further state that since the date Defendants originally filed their arbitration claim, Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class

- 7 -

action lawsuit on behalf of all persons similarly situated. Defendants further state the Claim speaks for itself regarding what Defendants sought to arbitrate.

26.     ¶ 26. Deny. Defendants further state that since the date Defendants originally filed their arbitration claim, Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated.

27.     ¶ 27. Deny. Defendants further state that since the date Defendants originally filed their arbitration claim, Plaintiffs have waived the enforcement of any agreement to arbitrate and/or any limitations on Defendants' right to seek and obtain a trial by jury and certification as a class action lawsuit on behalf of all persons similarly situated.

28.     ¶ 28. Defendants state they deny knowledge or information sufficient to form a belief as to whether "Arbitration under the FAA is a matter of consent," as to whether "the United States Supreme Court has recognized, unexpected and involuntarily class arbitration fundamentally alters the risks and benefits of the original arbitral bargain," and as to whether "It transforms bilateral, inherently limited commercial disputes into sprawling, high-stakes matters that the parties never agreed to resolve without the safeguards afforded by actual litigation, such as full appellate review." Defendants further state the allegations and statements in ¶ 28 call for a conclusion of law, to which no response is required.

29.     ¶ 29. Deny.

### FIRST CAUSE OF ACTION

30.     ¶ 30. Adopt by reference the answer to the allegations incorporated by reference.

31.     ¶ 31-35. Deny.

## SECOND CAUSE OF ACTION

32.     ¶ 36. Adopt by reference the answer to the allegations incorporated by reference.

33.     ¶ 37-41. Deny.

## AFFIRMATIVE AND OTHER DEFENSES

34.     The Complaint fails to state any claims upon which relief can be granted.

35.     Plaintiffs' claims are barred by the doctrines of consent, waiver, estoppel, laches, acquiescence, unclean hands, and equity.

36.     Plaintiffs' claims are barred in whole or in part by the applicable statutes of limitation.

37.     Plaintiffs' claims are barred in whole or in part by the statute of frauds.

38.     Plaintiffs, or others in privity with Plaintiffs, have released claims asserted in the Complaint.

39.     The Court lacks jurisdiction over this case.

40.     Venue is not proper in this Court.

41.     Plaintiffs DeVry Education Group, Inc. and DeVry/New York, Inc. are not parties to the enrollment agreements attached to the Complaint (the "Agreements") and the arbitration clauses set forth therein (the "Arbitration Clauses"), and therefore such Plaintiffs lack the capacity to sue.

42.     Plaintiffs DeVry Education Group, Inc. and DeVry/New York, Inc. are not parties to the Agreements or the Arbitration Clauses, and therefore such Plaintiffs lack standing to sue.

43.     Plaintiffs' action for declaratory judgment fails for lack of case or controversy.

44.     The claims asserted in the Complaint are moot.

45.     The Agreements and Arbitration Clauses attached to the complaint are contracts of adhesion and are unconscionable and unenforceable.

46.     The Agreements and Arbitration Clauses are void *ab initio* for illegality and false and misleading disclosures.

47.     To the extent the parties have enforceable Agreements and/or Arbitration Clauses, Plaintiffs materially breached the Agreements and Arbitration Clauses by failing to provide the services or products bargained for.

48.     To the extent Plaintiffs' claims are founded on the existence of enforceable Agreements and/or Arbitration Clauses, the Agreements and Arbitration Clauses fail for lack of consideration.

49.     Plaintiffs' conduct constitutes fraud under the Agreements and the Arbitration Clauses.

50.     Plaintiffs have suffered no harm as a consequence of the allegations set forth in the Complaint.

51.     Plaintiffs' claims for injunctive and other equitable relief are barred because Plaintiffs' have an adequate and complete remedy at law

52.     Defendants reserve the right upon completion of discovery and investigation and otherwise to assert such additional defenses as may be appropriate.

Wherefore Defendants respectfully request this Court:

A.      dismiss Plaintiffs' Complaint with prejudice;

B.      enter judgment in favor of Defendants;

C.      award Defendants their reasonable costs and attorneys' fees; and

D.      award Defendants such other and further relief as the Court deems just, proper, and appropriate.

## DEFENDANTS' COUNTERCLAIM

1.      Counter-Claimants T'Lani Robinson and Robby Brown individually and on behalf of all other persons similarly situated, by their undersigned attorney, file these counterclaims against DeVry Education Group Inc. ("DEG"), DeVry University, Inc. ("DVU"), and DeVry/New York, Inc. ("DVNY") (individually referred to herein as a "Counter-Defendant" and collectively as the "Counter-Defendants") to, without limitation, obtain a declaration that Counter-Defendants' actions were unlawful and obtain damages and restitution as further set forth below, and allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, including, *inter alia*, the investigation conducted by and through their attorney, which includes, without limitation, a review of Counter-Defendants' public documents, announcements, and wire and press releases published by and regarding Counter-Defendants, and information readily obtainable on the internet.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because: (a) at least one member of the putative Class is a citizen of a state different from Counter-Defendants; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (c) the proposed Class consists of more than 100 Class Members; and (d) none of the exceptions under the subsection apply to this action.

3.      This Court has supplemental jurisdiction over the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq.* ("UDTPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq.*  (the "ICFA"), the Illinois Private

Business and Vocation Schools Act, 105 ILCS 425/1, *et seq*. (the "VSA"), and other state statutory and common law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction over pendent state law claims).

4.     This Court has personal jurisdiction over Counter-Defendants because: (a) Counter-Defendants are registered to, and in fact do, conduct business in Illinois; and (b) have sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the markets within Illinois through the promotion, sale, marketing, and distribution of its products and services, to render the exercise of jurisdiction by this Court proper and necessary.

5.     Venue is proper in this District under 28 U.S.C. § 1391 because: (a) Counter-Defendants have their principal place of business in this District at 3005 Highland Parkway, Downers Grove; (b) Counter-Defendants regularly transact, solicit, and conduct substantial business in this District; and (c) a substantial part of the events or omissions giving rise to Counter-Claimants' claims alleged herein occurred in this District.

## PARTIES

6.     Counter-Claimant T'Lani Robinson is a natural person and resident of the state of Georgia who enrolled and purchased and paid for a DeVry education commencing on or about May 8, 2013, with student loans and other funds, the value of which was substantially and materially less than what was falsely represented, warranted, promised, covenanted, and conditioned on being, by DeVry, including without limitation in its form enrollment agreement with her (the "Post-2010 Agreement").

7.     Counter-Claimant Robby Brown is a natural person and resident of the state of Missouri who enrolled, and purchased and paid for a DeVry education commencing on or about

May 21, 2010, with student loans and other funds, the value of which was substantially and materially less than what was falsely represented to him by DeVry.

8.     Counter-Defendant DeVry Education Group, Inc. is a publicly traded Delaware corporation with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. DEG was formerly known as DeVry Inc. DEG transacts or has transacted business throughout the United States. At all times material to this action, acting alone or in concert with others, DEG has advertised, marketed, distributed, or sold educational products and services to consumers and students in Illinois and nationwide throughout the United States, and with respect to the acts and practices of DVU and DVNY that are described herein: (a) dominated and controlled DVU's and DVNY's acts and practices; (b) knew and approved of DVU's and DVNY's acts and practices; and (c) benefitted from DVU's and DVNY's acts and practices. Individually and collectively DEG, DVU, and DVNY may be referred to herein as "DeVry."

9.     Counter-Defendant DeVry University, Inc., a Delaware corporation, is a subsidiary of DEG with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. DVU transacts or has transacted business nationwide throughout the United States. At all times material to this action, acting alone or in concert with others, DVU has advertised, marketed, distributed, or sold the educational products and services to consumers and students in the State of Illinois and nationwide throughout the United States.

10.     Counter-Defendant DeVry/New York Inc., a Delaware corporation sometimes doing business as DeVry College of New York, is a subsidiary of DEG, with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. At all times material to this action acting alone or in concert with others, DVNY has advertised, marketed, distributed, or sold

educational products and services to consumers and students in the States of Illinois, New York, and nationwide throughout the United States.

11.     At all times mentioned in the claims, causes of action, and controversy alleged herein, each and every Counter-Defendant was acting in concert with, and/or was an agent and/or employee of each and every other Counter-Defendant.  In performing the acts and/or omissions stated herein, each and every Counter-Defendant was acting within the course and scope of a common enterprise and this agency or employment, and was acting with the consent, permission, or authorization of each of the remaining Counter-Defendants.

12.     All actions of each Counter-Defendant as alleged in the causes of action stated herein were ratified and approved by every other Counter-Defendant or its officers or managing agents, and by agreeing to actively conceal the true facts regarding the acts or omissions, and in committing the wrongful acts alleged herein, Counter-Defendants have pursued, or joined in the pursuit of a common course of conduct, and have acted in concert via agreement with, and conspired with, one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Claim.

13.     In addition, each of the Counter-Defendants rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Counter-Defendant acted with knowledge of the primary wrongdoing, and was aware of its overall contribution to and furtherance of the wrongdoing.

14.     Counter-Claimants bring this class action counterclaim on behalf of themselves and all other similarly situated persons against Counter-Defendants DEG, DVU, and DVNY:

(a) for violations of State law, including without limitation the Illinois UDTPA, 815 ILCS 505/1, *et seq.*, the ICFA, 815 ILCS 510/1, *et seq.*, and the Illinois VSA, 105 ILCS 425/1, *et seq.*;

(b) for breach of DeVry's contractual provisions and the representations, warranties, promises, conditions precedent, and covenants set forth in DeVry's standard form enrollment agreement with Counter-Claimant Robinson and other consumers that:

(i) "DVU publishes accurate information about its programs, policies, services, and graduate outcomes";

(ii) "Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry"; and

(iii) "DeVry's graduate employment statistics do not Include [sic] graduates who do not actively participate in an employment search,"

(collectively referred to as the "Breached Conditions and Covenants");

(c) for attendant state common law claims, including without limitation misrepresentation, concealment, negligence, conversion, and unjust enrichment;

(d) to stop and obtain declaratory relief that Counter-Defendants' deceptive acts and practices of making misrepresentations and deceptive omissions of material facts in the advertising, marketing, distribution, and sales of educational products and services to consumers violate applicable State law; and

(e) to obtain redress and restitution for all persons injured by Counter-Defendants' conduct.

## FORM AND NATURE OF THE COUNTERCLAIM

15.     This is a class action for breach of contract and claims sounding in unfair and deceptive, misleading, and confusing trade practices for unlawful acts and omissions conducted within the state of Illinois, and directed at its citizens as well as other persons within Illinois and around the nation, brought on behalf of all consumers and persons other than Counter-Defendants who purchased or otherwise paid for an education and related educational products and services sold by DeVry (the "Education") between January 1, 2008 and April 8, 2016, both dates inclusive (the "Class Period").

16.     Counter-Claimants seek:

(a)     declaratory relief that Counter-Defendants' deceptive acts and practices of making misrepresentations and deceptive omissions of material facts in the advertising, marketing, distribution, and sales of the Education violate applicable State law, including without limitation the Illinois UDTPA, 815 ILCS 510, *et seq*., the ICFA, 815 ILCS 505/1, *et seq.,* and the Illinois VSA, 105 ILCS 425/1, *et seq*.

(b)     to obtain restitution and damages from Counter-Defendants for breach of contract and the Breached Conditions and Covenants set forth in Counter-Defendants' form Post-2010 Agreement;

(c)     to obtain restitution and damages from Counter-Defendants for their fraudulent misrepresentations and concealment, negligent acts and omissions, and breach of duty owed to Counter-Claimants in violation of applicable laws, statutes, regulations, and standards;

(d)     to pursue equitable remedies, including without limitation rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

(e) declaratory and injunctive relief to stop, prevent, and remedy Counter-Defendants' unlawful conduct.

## **BACKGROUND**

17. DEG is a Delaware corporation and for-profit education company headquartered in Downers Grove, Illinois. DEG's stock is publicly traded on the NYSE under the ticker symbol "DV." DEG has a market capitalization of over a billion dollars and total annual revenues approaching $2 billion.

18. DEG owns and operates DVU and DVNY which collectively comprise approximately 60 campuses in the United States, along with an online division, and offers 10 certificate, diploma, and degree programs with over 30 concentrations in health care, business, and technology for five different colleges and a graduate school of business.

19. Enrollment growth is critical to DeVry because many students drop out. DeVry's 2014 The Graduation Rate for the 2008 Entering Class to which the Grad Rate Applies was 18%. See Exhibit A attached hereto and incorporated herein by this reference. As recently as April 8, 2016, DeVry advertised on its website that 90% of the 2013 graduates in all Undergraduate Degree programs who were already employed, or actively sought employment, had careers in fields related to their education with six months of graduation. See Exhibit B attached hereto and incorporated herein by this reference.

20. Enrollment growth is also critical because like most publicly traded for-profit educational companies, it is a closely watch metric by Wall Street analysts. In order to meet revenue and profit expectations, and keep its doors open, DeVry must recruit and enroll as many students as possible.

21.     To do this, DeVry spends hundreds of millions of dollars each year (**e.g.**, $288 million in 2009) advertising, marketing, recruiting, and promoting DeVry's graduate placement and income claims in connection with its Education.  DeVry also employs a large sales and recruiting staff to promote its "graduate outcome" claims.

22.     To recruit new students, DeVry's has made false, deceptive, and unfair claims about the job placement rates of its graduates, including without limitation that 90% of DeVry graduates who were actively seeking employment had obtained jobs in their field of study within six months of graduation (the "90% Placement Claim").  DeVry has also made false, deceptive, and unfair claims about the median income levels of its graduates, including without limitation that one year after graduation its bachelor's degree graduates on average earn 15% more than graduates from other colleges and universities.  See Exhibits C and E attached hereto and incorporated herein by this reference for examples of DeVry advertisements and its illegal claims.

23.     As recently as April 8, 2016, DeVry in addition to its claim that 90% of the 2013 graduates in all Undergraduate Degree programs who were already employed, or actively sought employment, had careers in fields related to their education with six months of graduation, DeVry also advertised that its Bachelor's Degree Management Program had a 6-month graduate placement rate of 97%.  See Exhibit B.

24.     In fact, the true gainful employment rate and graduate employment statistic for the 2014 Bachelor's Degree Management Program is just 20%.  See Exhibit D attached hereto and incorporated herein by this reference.

25.     DeVry's 2014 graduation rate was between 18% and 42%.  See Exhibit A.  Thus, what DeVry doesn't tell consumers is that at enrollment, your chances of completing, for example, the Bachelor's Degree Management Program and landing a job in that field within six months of

graduation is at best just 3.6%. The true statistics for DeVry's overall and other program graduate outcomes are similarly dismal, rendering DeVry promotional and advertising statements false and misleading.

26.     Historically, DeVry has derived nearly 80% of its revenues from Title IV federal education funds, such as the Pell grant, Stafford loan, and Veterans Affairs education programs, which assist students in paying for higher education. According to the U.S. Department of Education, DeVry received more than $1 billion in taxpayer dollars through federal student aid in 2015.

27.     DeVry students cumulatively hold $8.3 billion in student debt – the fourth highest debt volume of any higher education institution in America – and have a 2009 five-year cohort default rate of 43%.[2] This means that approximately $3.6 billion in revenues that DeVry received from students in the form of federal student loans is now either in forbearance or in default.

28.     DeVry's 90% Placement Claim and other advertisements and publications regarding graduate outcomes were unsubstantiated, false, inaccurate, misleading, confusing, deceptive, unfair, illegal, and violated applicable State and federal laws (the "Illegal Claims"). Throughout the Class Period, Counter-Defendants breached their contractual representations, warranties, promises, conditions precedent, and covenants that their advertising and published

---

[2] Dick Durbin, United States Senator Illinois, 01.27.16 Newsroom Press Release, **Durbin: "FTC Charges Of Deception Against DeVry University Are The Latest Chapter In The Shameful Story Of So Many For-Profit Colleges"** - *Students From DeVry University Are The 'Story Behind The Story' Cumulatively Holding $8.3 Billion In Student Debt, But Nearly Half Aren't Prepared To Pay It Back* - [WASHINGTON, D.C.] – After learning that the Federal Trade Commission (FTC) filed suit against DeVry University, U.S. Senator Dick Durbin (D-IL) today said "it's time to clean up the for-profit college industry and stand up for students and taxpaying families." DeVry University is a for-profit college whose students cumulatively hold $8.3 billion in student debt – the fourth highest debt volume of any higher education institution in America – and have a 2009 five-year cohort default rate of 43%. http://www.durbin.senate.gov/newsroom/press-releases/durbin-ftc-charges-of-deception-against-devry-university-are-the-latest-chapter-in-the-shameful-story-of-so-many-for-profit-colleges

information was accurate and complete when, in fact, it was false, deceptive, unfair, and misleading, and failed and omitted to disclose material facts, about the employment outcomes of DeVry graduates in connection with the Education it was selling to students.

29.     DeVry represented to Counter-Claimants, prospective students, and others that its superior Education was the reason for its graduate employment outcomes, the 90% Placement Rate, and the income success of its graduates. DeVry integrated the 90% Placement Claim and other false claims in connection with its graduate outcomes into the DeVry brand, then widely disseminated and leveraged these deceptive and misleading employment outcomes through a number of advertisements and advertising channels, including without limitation television commercials, on DeVry websites, in telephone and face to face sales pitches with prospective students, in brochures and catalogs, print advertisements, in social media advertisements such as on YouTube, Facebook, and Twitter, in radio ads, in other advertising and promotional materials, in press releases, in securities filings, in earnings conference calls with analysts and investors, in letters to students and shareholders, and in other communications with students, consumers, investors, and analysts.

30.     Commencing after May 2010, and no later than December 28, 2011, and continuing to the present, Counter-Defendants represented, warranted, promised, made a condition precedent, and covenanted in its form Post-2010 Agreement with Counter-Claimant Robinson and other consumers who purchased an Education from DeVry (referred to herein as "Students") that:

**Accurate Information Disclosure**

 "DeVry publishes accurate information about its programs, policies, services, and graduate outcomes. Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry."

31.     Commencing after May 2010, and no later than December 28, 2011, and continuing through April 8, 2016, Counter-Defendants incorporated into the Post-2010 Agreement by reference the 90% Placement Claim and other representations, warranties, promises, conditions precedent, and covenants of graduate outcome information on its website by providing in the contract:

> "For comprehensive consumer information, please visit
> devry.edu/studentconsumerinfo."

32.     Commencing after May 2010, and no later than December 28, 2011, and continuing to the present, Counter-Defendants represented, warranted, promised, and covenanted in the Agreement with Counter-Claimaint Robinson and other Students that:

**Career Services**

> "DeVry's graduate employment statistics do not include graduates who do not actively participate in an employment search."

33.     Commencing after May 2010, and no later than December 28, 2011, and continuing to the present, DeVry represented, warranted, promised, made a condition precedent, and covenanted in its Agreement with Counter-Claimant Robinson and other Students that the Illegal Claims were complete and accurate, and incorporated them by reference into the Post-2010 Agreement's terms and conditions.

## COUNTER-CLAIMANTS' COMMON FACTUAL ALLEGATIONS

34.     DVU's total annual undergraduate enrollment in July 2014 was 37,210 Students and 31,292 in July 2015.  There were 10,045 Students enrolled for the July 2015 session in DVU's graduate programs.  Since 1975, more than 870,000 Students have enrolled at DVU.

35.     Since at least 2008, in its efforts to promote itself, DVU represents, expressly or by implication, in television commercials, on its websites, in telephone and face to face sales pitches

with prospective students, in brochures and print advertisements, in social media advertisements such as on YouTube, Facebook, and Twitter, in radio ads, and in other advertising and promotional materials, without limitation that: (a) as a result of obtaining a DVU degree, 90% of DVU graduates, from a specific year (*e.g.*, 2012) or during a specific period (*e.g.*, since 1975 or "for more than 30 years") who were actively seeking employment obtained a new job in their field of study within six months of graduation; and (b) that DVU bachelor's degree graduates earn 15% more than graduates from other colleges and universities as a result of obtaining their degree from DVU and that one year after graduation, the average or median earnings of DVU graduates with bachelor's degrees were 15% higher than the average or median earnings of graduates with bachelor's degrees from all other colleges and universities.

36.     To substantiate their promotional and advertising claims, Counter-Defendants use information they obtain from Students about their majors, graduation dates, their employment, and DVU's classifications of their employment status and from other third parties. Counter-Defendants used and manipulated these records to calculate the 90% Placement Claim, 15% greater income figures, and other false graduate outcome statistics they use in their advertisements and sales pitches.

37.     The data, records, and information used by Counter-Defendants to make the Illegal Claims that DeVry represented, warranted, promised, and covenanted as accurate and complete do not provide a reasonable basis that substantiates Counter-Defendants' claims because, among other reasons, Counter-Defendants counted a substantial number of DVU graduates as having been placed successfully who should not be counted as such as graduates (such as those who were employed when they enrolled and who never actively participated in an employment search), and similarly excluded a substantial number of DVU graduates in the pool of those actively seeking employment who should not be excluded. As examples, and without limitation, Counter-Defendants count

graduates who did not obtain a job as a result of obtaining a degree from DVU, and include DVU graduates who after graduation continued with the same job they had when they enrolled in DVU.

38.     Counter-Defendants also unreasonably count jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study and exclude Students as "inactive" who were in fact seeking jobs. The actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%.

39.     Counter-Defendants also hired a third party company to obtain income data from Students who had graduated from DVU and other schools in 2010 which it then used and manipulated the data in its 2012 summary income information. In representing the higher income claim they use in their advertisements and sales pitches, DeVry knew, or should have known, the reliability of the conclusions and information contained in the income report was contradicted by its own data because, without limitation, the information did not account or adjust for material differences such as age, experience, and degree field. Further, income statistics collected by DeVry directly from thousands of its own graduates each year materially differed from the third party report consisting of a sample size of only several hundred individuals per year.

40.     Counter-Defendants had extensive and contradictory information in their own files about the graduate outcomes and income of DVU graduates as well as publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field which shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined.

41.     Counter-Defendants' Illegal Claims about placement and income are false and unsubstantiated. Counter-Defendants unjustly converted monies and profited from these

misrepresentations and material omissions because Students unknowingly create increased sales and profits for Counter-Defendants in buying the Education having a lower value than specified and contracted for, at a price higher than what they would otherwise be willing to pay therefore, if indeed they would purchase a DeVry Education willingly at all.  This case seeks to have these practices declared unlawful, including without limitation as a violation of applicable State law, and obtain relief for Counter-Defendants' unlawful conduct and the Breached Conditions and Covenants in connection with the accuracy and completeness of the Illegal Claims.

42.     Counter-Defendants are aware that Counter-Claimants and Students lack the material information regarding the statistics used in their placement and income advertising, including the methods, methodology, and reliability of how such claims are substantiated. Counter-Claimants and other Students purchased a DeVry Education represented, warranted, promised, and covenanted to be, and conditioned on being, of superior value to other competing educational products and services based on the accuracy and completeness of its Illegal Claims when, had they known the Breached Conditions and Covenants and Illegal Claims were false, would otherwise not have willingly paid the inflated purchase price for the Education, if in fact they would have purchased the Education from DeVry at all.

43.     DeVry's financial performance depends on the number of Students who sign up for and take classes at any of its schools or online.  For decades (DeVry claims a track record going back to 1975) DeVry's 90% Placement Claim has been the heart and soul of its advertising and promotional brand used to drive enrollment.   Since 1991, when DeVry went public, the 90% Placement Claim has been touted to not only Students and other consumers, but also to Wall Street, investment analysts, and the investment community to drive its stock price.

- 24 -

44.     DeVry has effectively so branded itself by its 90% Placement Claim as to be married to it.  DeVry is so married to its 90% Placement Claim, it is so core, so central, so important, and so material to DeVry's brand, that Counter-Defendants could not falsely make it without being aware that it is false.

45.     In fact, because Counter-Defendants advertised the Illegal Claims, it is unlawful for them not to provide Students, at or before the time the prospective student applies for enrollment, with the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of their advertisements.  20 U.S. Code § 1094, 34 CFR 668.41(d), and 34 CFR 668.14 (b)(10).  It would not only be illegal, but also nigh impossible for a prospective Student to apply or enroll for a DeVry Education without DeVry's making the Illegal Claims to him or her.  Counter-Defendants in fact made the Illegal Claims to Counter-Claimants, each prospective Student, and each member of the putative class defined below.

### *False Advertising on the Internet, in Print, and on Television and Radio*

46.     Since at least 2008, Counter-Defendants have made their 90% Placement Claim in numerous television advertisements in both English and Spanish. These advertisements have run on national broadcast, satellite, and cable channels and stations and some have run on DVU's YouTube channel.

47.     These advertisements state verbally and/or in writing, in English and in Spanish, without limitation: (a) "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months."; (b) "90% of our grads actively seeking employment had careers in 6 months."; (c) "Join the 90%.  Learn how at devry.edu."; (d) "The offer letter. If you're going to college, or back to college, that's your bull's-eye. It is for DeVry University students. In

fact, for more than thirty years, 90% of all graduates in the active job market had careers in their fields within six months. 90%."; (e) "This is the guy ready for a great career in technology. "90% of our grads actively seeking employment had careers in 6 months."; and (f) 90% of DeVry University grads actively seeking employment had careers in their field in six months. Learn how at devry.edu."

48.     Since at least 2008, Counter-Defendants have made their 90% Placement Claim and higher income claims on various DVU webpages, including without limitation on the DVU website, at www.devry.edu.   Examples of the claims made on such webpages include without limitation: (a) "Excellent employment results.  Nobody wants to go to college and just be a number . . . unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study."; (b) "**Do DeVry University graduates get good jobs?** Employers want DeVry University graduates. More than 90% of our new graduates quickly land jobs in their fields of study within six months of graduation (learn more). This is a true testament to the fact that DeVry University teaches what companies are looking for. . . . DeVry University graduates leave school well-prepared to enter the workforce and begin contributing immediately."; and (c) "**Outstanding Career Services -** In addition to a relevant education and a highly respected degree, DeVry University offers invaluable career services that have helped thousands of students begin rewarding careers in their fields. The proof is the numbers. Since 1975, 265,869 undergraduate students have graduated from DeVry and 90% of those in the active job market were employed in career related positions within six months of graduation."

49.     Counter-Defendants have used Twitter to make promotional representations of DVU's public Twitter page at https://twitter.com/DeVryUniv including without limitation: (a)

on or about September 14, 2009 using @devryuniv by tweeting: "For over 30 years, 90% of all DeVry graduates in the active job market had careers in their fields within six months: http://bit.ly/hyYns; and (b) on or about July 29, 2013 using @DeVryGroup by tweeting "90% of #DeVry grads active in the job market find employment in their field of study within 6 months. @DeVryUniv president Dave Pauldine."

50.     Counter-Defendants have made similar 90% Placement Claims in print advertisements, handouts to prospective students, and brochures, and academic catalogs.  In the 2008-2009 DeVry Academic Catalog, DVU President David J. Pauldine represented:

> " . . . since 1975, DeVry has graduated more than 230,000 students at the undergraduate level. Of graduates in the active job market, 90 percent were employed in career-related positions within six months of graduation.  It's no wonder we say with conviction that at DeVry, we major in careers."

In the 2009-2010 DeVry Academic Catalog, Mr. Pauldine represented:

> "For over 30 years, of DeVry graduates in the active job market or already employed, 90 percent have enjoyed careers in their field of study within six months of graduation."

### Sales Pitches and Slide Shows

51.     DVU's marketing and sales involves both inbound and outbound campaigns. DVU's inbound campaign involves promotional and advertising materials to generate phone calls to DVU *from* prospective students, while DVI's outbound campaign involves DVU sales personnel making cold call and lead generated phone calls *to* prospective students.

52.     Prospective DVU students often have multiple conversations with DVU sales representatives.  During the course of these phone calls, Counter-Defendants make statements and representations as set forth herein to induce prospective students to enroll for a DeVry Education.

53.      Since at least 2013, DVU's sales staff has told prospective students: "The DeVry University difference includes outstanding career outcomes—In 2012, 90% of DeVry University grads actively seeking employment had careers in their field within six months of graduation."

54.      Prospects are invited to one or more interviews that take place either in person on a DVU campus or by telephone. Prospective students who are interested in attending a DVU campus are invited to take a tour followed by an interview with a DVU "Admissions Advisor" and other salespeople.

55.      Prospective online students are invited to have one or more telephonic interviews with an Admissions Advisor.  Although titled "admissions advisors", "enrollment advisors", "financial advisors", or "enrollment counselors," an internal document makes the job function of these DeVry employees clear: "This is a sales position."  As one salesman (who was told to represent himself as a "military adviser" to veterans) said, it was critical to get "asses in classes."

56.      During the campus tour, some prospects, like Counter-Claimant Robinson, are fed lunch, and/or shown a graduation uniform, and/or photos of a mock graduation are taken with the prospects wearing the graduation uniform.  For the interview stage of the sales pitch, Counter-Defendants have provided the Admissions Advisors and salespeople with a training guide as well as other guidelines instructing the Admissions Advisor on how to pitch the prospect. DVU Admissions Advisors are also armed with a PowerPoint slide presentation to use during the interview.  When the interview takes place by telephone, the prospective student may be directed to a website that allows the prospect to walk through a slide presentation with the Admissions Advisor.

57.     DVU's Admissions Advisors represent during the interviews with prospective students that one of the benefits of obtaining a DVU degree is that, as a result of attaining that degree, 90% of DVU graduates obtain jobs in their field soon after graduating.  The training guide instructs the Admissions Advisor to tell the prospect, "[a]s a result of these types of career assistance our graduates have shown excellent career results, let's take a look at those."  The prospective student is then immediately shown a slide on DeVry's website entitled "Excellent Employment Results."

58.     This slide includes, without limitation, the following text:   In 2012, 90% of DeVry University graduates from all programs who actively sought employment had careers in their field of study within six months of graduation.  Within that same population:  83% of associate degree graduates had careers in their field − 92% of bachelor's degree grads had careers in their field.

59.     The Admissions Advisors are instructed to "[r]ead the career statistics on the screen verbatim" and to click a link to access "employment statistics."  If the interview is conducted in person, the Admissions Advisor provides a paper copy of this information to the prospect.

60.     DVU Admissions Advisors are told to respond to employment assistance questions from the prospect with a statement that, "DeVry offers career services that include assistance with job searches, resume preparation, practice interviews, career fairs, etc.  These services are very successful, as evidenced by our employment statistics."

61.     The Admissions Advisors are also instructed to represent to prospects that one year after graduation, DeVry University grads report earning 15% more than the median earning reported by all other bachelor's degree graduates.  DVU Admissions Advisors are also

instructed to ask prospects, "How do you think having a 15% higher median earning helped those students?"

62.     The core focus of DeVry's Illegal Claims on graduate employment outcomes and the 90% Placement Claim, is demonstrated in a "Letter to Shareholders" addressed to "Fellow Owners, Students, Colleagues, and Friends" written on or about August 29, 2013 by DEG Chief Executive Officer Daniel Hamburger which stated:

> "The ***best measure of our quality is the successful outcomes*** that our students achieve. Notably, ***90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation***, earning an average of more than $43,500 annually." [***Emphasis added.***]

And,

> "PayScale recently validated the ROEI [return on educational investment] of DeVry University, ***ranking three campuses in the top 100 list of PayScale's annual College Return on Investment Report***." [***Emphasis added.***]

The letter was signed by Mr. Hamburger.

### *The 90% Placement Claim Is Inaccurate, Incomplete, Misleading, Confusing, and False*

63.     DVU collects and maintains files of information obtained from communications with DVU students.  These records contain information about the students' majors, graduation dates, their employment, and DVU's classifications of their employment status.  DVU's staff conducts analysis of those files and Counter-Defendants manipulate these records to calculate the 90% figure and other Illegal Claims they use in their advertisements and sales pitches.

64.     These student records do not substantiate Counter-Defendants' Illegal Claims because, without limitation:  (a) Counter-Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU; (b) Counter-Defendants include a significant number of DVU graduates who had with the same job after graduation as they had when they

enrolled who were not actively seeking employment; (c) and Counter-Defendants count graduates who did not obtain jobs a reasonable consumer or any other person could reasonably consider to be in the graduate's field of study.

65.    Many of the graduates themselves do not consider themselves as employed in their field of study when reporting to DVU, but Counter-Defendants misrepresent them as employed in their field, including without limitation in the class of 2012:  (a) graduates with degrees in technical management who were working as: a rural mail carrier (human resources concentration); a yard salesman at a nursery (business information systems concentration); a sales associate at Macy's (general technical concentration); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources concentration); and unpaid volunteers at medical centers (human resources management and health services management concentrations);   (b) a graduate with a degree in business administration (health services management concentration) working as a server at the Cheesecake Factory;  (c) a graduate with a degree in business administration (health care management concentration) working as a car salesman; (d) a graduate with a degree in business administration (accounting concentration) working as a secretary at a prison; and (e) graduates with various degrees working as customer service representatives.

66.    Students who informed Counter-Defendants they were actively seeking employment (*i.e.*, reviewing jobs in the DVU database, attending job interviews, attending DVU career fairs, actively applying for positions, and actively following up with prospective employers) within days before the six-month, 90% calculation are being knowingly classified as "inactive" and excluded from Counter-Defendants' analysis.

67.     Counter-Defendants' own data shows the actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is significantly and materially smaller than 90%.

***Higher Income Claims Are Inaccurate, Incomplete, Misleading, Confusing, and False***

68.     In 2012, Counter-Defendants hired a third-party to prepare a report from income data given it by DVU and obtained from other schools in 2010.  Counter-Defendants questioned, the reliability of the conclusions and information contained in the income report, but nonetheless knowingly made the 15% higher income misrepresentations.

69.     DVU personnel questioned the information and conclusions of the income report and whether the data was accurate and sufficient to supported their higher-income claim because, without limitation:  (a) the data did not take into account age, experience, and field; (b) the sample size consisted of only several hundred individuals for each graduation year and was therefore not statistically significant; and (c) the statistics in the income report materially differed from DVU's own income data that it had collected from thousands of its own graduates for each graduation year.

70.     Counter-Defendants were also aware of and familiar with publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field.  Counter-Defendants knew or should have known their higher income representations were false because, without limitation, the information in Counter-Defendants' own files compared to publicly available income data shows that DVU graduates do not earn materially more than graduates from other schools one year after graduation.

71.     Counter-Defendants reliance on the third-party data for its higher-income claim was unreasonable.   Counter-Defendants knew or should have known the conclusions and

*DeVry Education Group, Inc., et al. v. T'Lani Robinson, et al.* No. 16-cv-7447
**ANSWER AND COUNTERCLAIM**

information contained in the income report were false because of their own questioning of the methods and methodology of the survey that underlay the income report. Counter-Defendants knew or should have known that their higher income claims and representations were false and unreliable.

### *The FTC False and Deceptive Advertising Lawsuit*

72.    On January 27, 2016, the Federal Trade Commission ("FTC") filed a civil complaint (the "FTC Lawsuit") against DeVry in the United States District Court for the Central District of California alleging that certain of DVU's Illegal Claims were false, deceptive, unfair, misleading, unsubstantiated, and illegal at the time they were made in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), as amended (the "FTC Act"). The Illegal Claims at issue relate to DVU graduates' employment rates and earnings relative to graduates of other colleges and universities. See Exhibit E attached hereto and incorporated herein by this reference for additional examples of the false advertising and Illegal Claims set forth in the FTC Lawsuit.

73.    The FTC Lawsuit seeks permanent injunctive relief against future alleged violations of the FTC Act, reimbursement of FTC costs, and such other relief as the court deems necessary to redress any consumer injury from the alleged violations, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. DeVry is under threat of losing access to federal financial aid from the Education Department if it fails to pull those advertisements and notify students of its inability to substantiate the claims and faces potential restitution and disgorgement payments of over $8 billion.

74.     Also, on January 27, 2016, DVU received a Notice of Intent to Limit from the Department of Education ("DOE") Office of Federal Student Aid (the "January 2016 Notice"), based on a portion of its pending August 28, 2015 inquiry, informing DVU of the DOE's intention to impose certain limitations on the participation of DVU in programs authorized pursuant to Title IV.   The proposed limitations relate to representations in advertising and marketing, regarding the post-graduation employment outcomes of DVU students over a period from 1975 to October 1980.

75.     On March 14, 2016 the Department of Veterans Affairs (the "VA") suspended DVU from participation in a program that identifies schools doing a good job of serving former troops in light of the FTC Lawsuit accusing the for-profit chain of misleading consumers about the employment and earnings of its graduates in advertisements.

76.     The VA is also conducting compliance reviews at all DeVry campuses to measure compliance with federal regulations. The agency has also posted a warning on its online GI Bill Comparison Tool to call attention to the FTC lawsuit against DeVry. The online tool is part of a series of resources directing agencies to implement and promote "principles of excellence" for educational institutions that interact with veterans, active service members and their families.

## CLAIMANT ROBINSON'S EXPERIENCE

77.     Counter-Claimant T'Lani Robinson is a resident of Decatur, Georgia.  Since at least 2010, Counter-Claimant had seen DVU's television ads touting their Illegal Claims, including without limitation the 90% Placement Claim.  In or around the first quarter 2013, Counter-Claimant received a cold call from a DeVry sales representative reciting the sales pitch touting DVU's Illegal Claims, including without limitation DVU's 90% Placement Claim, and

inviting her to attend a tour of the Decatur, Georgia DVU campus. Counter-Claimant went to DVU's website where, in addition to the ads she had seen on television and the representations made to her in the cold call, she was shown the Illegal Claims, including without limitation the 90% Placement Claim, in writing. Counter-Claimant was attending Georgia Perimeter College at the time she received the cold call.

78.     In or around the second quarter of 2013, Counter-Claimant was invited to and attended an in-person tour of the Decatur, Georgia DVU campus where she was fed lunch, shown the graduation uniform, had pictures taken of her in a mock graduation with other touring prospects, and met with Admissions Advisor Richard Wiggins who gave her the sales pitch and a computer presentation. The sales pitch and computer presentation reiterated verbally, on screen, and in writing the Illegal Claims, including without limitation the 90% Placement Claim and higher income misrepresentations.

79.     After the tour and initial interview, Counter-Claimant Robinson was mailed brochures and given student resource guides which contained the Illegal Claims. Thereafter Counter-Claimant also had numerous (at least another three) phone calls with a DeVry Admissions Advisor and/or other sales representatives, including Alexia Derizzio, as well as at least one additional interview at the Decatur campus.

80.     Mr. Wiggins, Ms. Derizzio, and the other DeVry representatives repeated the Illegal Claims sales pitch and advised and assured Counter-Claimant Robinson the higher cost of the Education would be paid for by grants, scholarships, and financial aid. Counter-Claimant Robinson was told during a meeting with a DeVry representative that she should nonetheless apply for a loan, just so she would get accepted and admitted to DVU.

- 35 -

81.     Claimant Robinson left Georgia Perimeter and enrolled at DVU. Counter-Claimant and DVU entered into the Post-2010 Agreement wherein DVU represented, warranted, promised, covenanted, conditioned, and made the Breached Conditions and Covenants about the accuracy and completeness of its information and the Illegal Claims, including without limitation the 90% Placement Claim and higher income claims. Counter-Claimant Robinson attended the DVU Decatur campus in 2013, ultimately spent more than $17,000 on the DeVry Education comprised of a $12,000 parent Plus loan which was paid directly to, and converted by, DVU to its own use, plus interest, and $5,000 in other funds, and paid other DVU Education related expenses such as books and supplies.

### CLAIMANT BROWN'S EXPERIENCE

82.     Counter-Claimant Robby Brown is a resident of Kearney, Missouri.  Since at least 2010, Counter-Claimant had seen DVU's television ads and heard DVU's radio ads touting their Illegal Claims, including without limitation the 90% Placement Claim.  In or around the first and second quarters of 2010, Counter-Claimant Brown had several telephone calls with DeVry where in DeVry recited the sales pitch touting DVU's Illegal Claims, including, as always, the 90% Placement Claim.

83.     Counter-Claimant Brown went to DVU's website where, in addition to the ads he had seen on television and heard on the radio, and the representations made to him in the phone calls, he shown the Illegal Claims in writing.  Counter-Claimant was also mailed brochures and other promotional material containing the Illegal Claims.  At the time, Counter-Claimant was starting the enrollment process to attend Centric College.

84.     In or around the second quarter of 2010, Counter-Claimant Brown spoke on the telephone several times (at least five to eight times) with one or more DeVry "Financial

Advisors," including without limitation Dale Masteas and Chris Dunlap, who repeated the Illegal Claims sales pitch and advised and assured him not to worry about the higher cost of the Education because it was superior to an education from Centric and would be "all covered by grants."

85.     On or about May 21, 2010, Counter-Claimant Brown met in person with Admissions Advisor Chris Dunlap who gave him the sales pitch, brochures, and a computer presentation. The sales pitch, written materials, and computer presentation reiterated verbally, on screen, and in writing the Illegal Claims, including without limitation the 90% Placement Claim and 15% higher income misrepresentation.  Between May 2010 and October 2010, Counter-Claimant Brown also met in person with Dale Masteas and other DeVry Representatives who repeated the Illegal Claims.

86.     Claimant Brown subsequently stopped the enrollment process at Centric and enrolled at DVU.  Counter-Claimant and DVU entered into an enrollment agreement and attended DVU at both of its Kansas City locations commencing in June, 2010, paid DVU approximately $16,579 in tuition comprised of student loans which were paid directly to and converted by DVU to its own use, plus interest, and paid for other DVU Education related expenses such as books and supplies.

## CLASS ACTION ALLEGATIONS

87.     Counter-Claimants bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all Members of the "Student Class," preliminarily defined as:

<u>The Student Class</u>

All Students who purchased or otherwise paid for and received a DeVry Education (the "Student Class" or "Student Class Members"), from January 1, 2008 until April 8, 2016 (the "Class Period"), inclusive.

Such persons are collectively referred to herein individually as a "Student Class Member" and

collectively as the "Student Class" or "Student Class Members."

88.     Additionally, Counter-Claimants bring this action pursuant to Federal Rule of

Civil Procedure 23 on behalf of themselves and all Members of the "DOE Borrower Class,"

preliminarily defined as:

<u>The DOE Borrower Class</u>

All Students who purchased or otherwise paid for and received a DeVry Education with direct student loan proceeds from the United States Treasury (a "Student Loan") and administered by the federal government Department of Education (the "DOE Borrower Class" or "DOE Borrower Class Members") during the Class Period, inclusive.

Such persons are collectively referred to herein individually as a "DOE Borrower Class

Member" and collectively as the "DOE Borrower Class" or "DOE Borrower Class Members."

89.     Additionally, Counter-Claimants bring this action pursuant to Federal Rule of

Civil Procedure 23 on behalf of themselves and all Members of the "Contract Class," preliminarily

defined as:

<u>The Contract Class</u>

All Students who: (a) entered into an enrollment agreement substantially in accordance with the terms and conditions of the Post-2010 Agreement wherein DeVry made the Breached Conditions and Covenants as set forth herein that the Illegal Claims and its advertising and other information and materials were accurate and complete; and (b) purchased or otherwise paid a DVU Education (the "Contract Class" or "Contract Class Members") during the "Class Period, inclusive.

Such persons are collectively referred to herein individually as a "Contract Class Member" and

collectively as the "Contract Class" or "Contract Class Members."

90.     The Classes described in this Complaint may be jointly referred to as the "Class" and proposed Members of the Classes may be jointly referred to as "Class Members."

91.     Excluded from the Class are Counter-Defendants; the officers, directors or employees of Counter-Defendants; any entity in which Counter-Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of Counter-Defendants. Also, excluded from the Class are any federal, state or local governmental entities; any judicial officer presiding over this action; the members of his/her immediate family and judicial staff; and any juror assigned to any part of this action.

92.     Plaintiffs satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 23 of the Federal Rules of Civil Procedure.

93.     <u>Numerosity</u>. Counter-Claimants do not know the exact number of Class Members at the present time. However, due to the nature of the advertising and commerce involved, there appear to be tens of thousands of Class Members such that joinder of all Class Members is impracticable.

94.     The Class is ascertainable by DeVry's business records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer breach of contract, unlawful trade practices, and class action controversies.

95.     <u>Commonality</u>. Common questions of law and fact exist for the Class. Counter-Defendants' breach of its contractual representations, warranties, promises, conditions precedent, and the Breached Conditions and Covenants in the enrollment Agreement with Class

Members similarly impacts Class Members, all of who purchased an Education from Counter-Defendants.

96.     Typicality.    Counter-Claimants assert claims that are typical of the Class. Counter-Claimants and all Class Members have been subjected to the same wrongful conduct and because the Contract Class all have entered into the enrollment Post-201 Agreement that contained false representations, warranties, promises, conditions precedent, and the Breach Conditions and Covenants and purchased an Education from Counter-Defendants that was not as represented, warranted, promised, covenanted, or of the standard specified.  As a result, Counter-Claimants and other Class Members purchased and paid for an Education which was worth less than what they contracted for and/or as represented, and for which they would not have paid as much, if indeed they would have purchased a DeVry Education at all.

97.     Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Class. Their interests do not conflict with Class Members' interests and they have retained counsel competent and experienced in complex litigation to vigorously prosecute this action on behalf of the Class.   In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3).

98.     Predominance.  Class certification is appropriate because common questions of law and fact, and common answers thereto, substantially predominate over any questions and answers that may affect only individual members of the Class, including, *inter alia*, the following:

    a.    Whether the DeVry Post-2010 Agreement was a valid and enforceable contract;

    b.    Whether DeVry breached its contractual representations, warranties, promises, conditions precedent, and covenants that its published information about its programs, policies, services, and graduate outcomes provided on its website, in its catalogs, and in

advertisements and other materials were complete and accurate;

c.    Whether Counter-Claimants and the Class were damaged as a proximate cause or result of Counter-Defendants' breaches;

d.    Whether Counter-Defendants failed to disclose that Counter-Defendants' Education and products and services were of a lower quality and value than, and not as, expressly represented, warranted, promised, and covenanted;

e.    Whether Counter-Defendants had a duty to disclose the truth about its Illegal Claims in connection with the DeVry Education and products and services;

f.    Whether Counter-Defendants knew or should have known their practices and representations related to the marketing, labeling and sales of the Education were false, misleading, or confusing;

g.    Whether Counter-Defendants are liable for negligence or gross negligence;

h.    Whether Counter-Defendants' misrepresentations and omissions about its Illegal Claims in connection with the DeVry Education and products and services were likely to deceive, confuse, or create a misunderstanding;

i.    Whether Counter-Defendants' conduct, practices, and representations related to the marketing, advertising, labeling, and sales of the DeVry Education and products and services were unfair, deceptive, confusing, misleading and/or unlawful in any respect, thereby violating the UDTPA;

j.    Whether Counter-Defendants collected, took, or received monies from Student Loan proceeds in Counter-Defendants' possession and belonging to Counter-Claimants and the Class and wrongfully converted such monies to their own use and benefit;

k.    Whether Counter-Defendants' practices and representations related to the marketing, labeling and sales of the Education breached conditions precedent in, of, or to the Post-2010 Agreement;

l.   Whether Counter-Defendants' practices and representations related to the marketing, labeling and sales of the Education breached express warranties;

m.  Whether Counter-Defendants' practices and representations related to the marketing, labeling and sales of the Education breached implied warranties; and

n.   Whether Counter-Claimants and members of the Class are entitled to rescission, restitutionary, injunctive, declaratory, or other relief.

99.      Further Class certification is also appropriate because Counter-Defendants have acted on grounds that apply generally to the Class, so that final injunctive and/or declaratory relief is appropriate respecting the Class as a whole.

100.     A class action is also superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the individual Class Members is impracticable. Furthermore, because the restitution and/or damages suffered, and continue to be suffered, by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually and the burden imposed on the judicial resolution system would be enormous.

101.     In addition, Class certification is appropriate under Rule 23(b)(1) or (b)(2) of the Federal Rules of Civil Procedure because:

a.   the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Counter-Defendants;

b.  the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.  Counter-Defendants have acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief described herein appropriate with respect to the proposed Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Illinois Uniform Deceptive Trade Practices Act
### (815 ILCS 510/1 *et. seq.*)
### (Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the Class)

102.  Counter-Claimants, on half of themselves and other Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

103.  Counter-Claimants, Class Members, and Counter-Defendants are "persons" under the UDTPA, 815 ILCS 510/1(5), which defines a "person" as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity."

104.  Under the UDTPA 815 ILCS 510/2(5), a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, "***represents that products or services have*** sponsorship, approval, ***characteristics,*** ingredients, ***uses, benefits***, or quantities that ***they do not have*** or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have."  [Emphasis added.]

- 43 -

105.    Under UDTPA 815 ILCS 510/2(7), a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, "r*epresents that products or services are of particular* standard, *quality*, or grade or that products are of a particular style or model, *if they are of another*."  [Emphasis added.]

106.    Under UDTPA 815 ILCS 510/2(9), a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person, "*advertises products or services with intent not to sell them as advertised*."  [Emphasis added.]

107.    Under UDTPA 815 ILCS 510/2(12), a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "*engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.*" [Emphasis added.]

108.    Through the means described herein above, Counter-Defendants have represented, expressly or by implication, in their advertising and promotional material that:  (a) as a result of obtaining a DVU degree, 90% of DVU graduates from a specific year who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (b) as a result of obtaining a DVU degree, for at least the last 10 years, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (c) one year after graduation, the average or median earnings of DVU graduates with bachelor's degrees were up to 15% higher than the average or median earnings of graduates with bachelor's degrees from all other colleges and universities; and (d) DVU bachelor's degree graduates earn up to 15% more than graduates from other colleges and universities, as described in part (c) above, as a result of obtaining a bachelor's degree from DVU.

109.     Each representation set forth in above is false, misleading, and/or confusing and was not substantiated at the time the representation was made.  Therefore, the making of each representation as set forth herein above constitutes a deceptive act or practice, in violation of the UDTPA.

110.     Counter-Defendants intended that Counter-Claimants and the Class Members rely on its deceptive practices in an attempt to induce them to purchase an Education from DeVry. Counter-Defendants' deception occurred during the marketing and sale of the Education and related products and services in the course of Counter-Defendants' business.

111.     Counter-Defendants had a duty arising from their superior knowledge of Counter-Defendants true placement statistics of its graduates as compared to consumers (*e.g.,* through Counter-Defendants' years of study of the statistics for the placement of its graduates) and its partial representations, omissions, and/or misrepresentations to the contrary, to disclose at the point of sale and/or otherwise that:  (a) the majority of DVU graduates from a specific year who were actively seeking employment had not landed or obtained new jobs in their field of study within six months of graduation; (b) as a result of obtaining a DVU degree, for at least the last 10 years, the majority of DVU graduates who were actively seeking employment had not landed or obtained new jobs in their field of study within six months of graduation; (c) one year after graduation, the average or median earnings of DVU graduates with bachelor's degrees were not any higher than the average or median earnings of graduates with bachelor's degrees from all other colleges and universities; and (d) DVU bachelor's degree graduates do not earn more than graduates from other colleges and universities as a result of obtaining a bachelor's degree from DVU.

112.     Counter-Defendants owed a duty to Counter-Claimants and the Class, and intentionally failed to disclose one or more important and material facts to Counter-Claimants and the Class; and/or Counter-Defendants disclosed some facts to Counter-Claimants and the Class, but willfully and intentionally failed to disclose one or more other important and material facts, making the disclosure deceptive misleading, and/or confusing; and/or Counter-Defendants willfully and intentionally failed to disclose one or more important and material facts that were only known to them and that Counter-Claimants and the Class could not have discovered; and/or Counter-Defendants actively concealed one or more important and material facts from Counter-Claimants and the Class and/or prevented them from discovering such fact or facts.

113.     Counter-Defendants failed to disclose and concealed the true facts that: (a) the 90% placement claim was false and that substantially and materially less than 90% of graduates were employed in their chosen field within six months of graduation; (b) graduates of DVU did not have any higher income than graduates from other schools; (c) Counter-Defendants questioned the methodology and statistical significance of the study upon which they based their 15% income claim; (d) Counter-Defendants' own statistics showed that graduates of DVU did not have any higher income than graduates from other schools and that such claim was false, misleading, deceptive and incomplete; (e) Counter-Defendants had no reasonable basis to make these representations without the disclosure of the fact that the statistics were false in connection with the Illegal Claims, including without limitation the 90% Placement Rate and 15% higher income rate; and (f) the Illegal Claims were misleading, deceptive, confusing, and incomplete.

114.     Counter-Defendants do not disclose that despite its awareness of the true facts regarding its Illegal Claims, including without limitation the 90% Placement Claims and 15% higher income claims, such claims are false.  These omissions would be material to a reasonable

- 46 -

consumer. Reasonable consumers are likely to be deceived and confused by Counter-Defendants' material misrepresentations and omissions.

115. Counter-Claimants and Class Members suffered injury-in-fact, including the loss of money, as a result of Counter-Defendants' unlawful, unfair, and/or deceptive practices. Counter-Claimant and members of the Class were directly and proximately injured by Counter-Defendants' conduct and lost money and incurred Student Loan debt as a result of Counter-Defendants' material omissions, because they would not have purchased or would not have paid as for the Education had they known the truth. Consumers are likely to be damaged by Counter-Defendants' continuing deceptive trade practices.

116. Counter-Claimants and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, their Student Loans resulting from Counter-Defendants' wrongful and unlawful conduct. Interest on Student Loans continues to accrue every day, whether such loans are in forbearance or default or not.

117. Counter-Claimants and the Class Member are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest. An actual dispute between Counter-Claimants and the other Class Members and Counter-Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

118. Counter-Claimants and the Class Members who took out Student Loans have a defense against repayment in any action to collect such loans based on any act or omission of Counter-Defendants that would give rise to a cause of action against Counter-Defendants under applicable State law. 34 CFR 685.206(c)(1) and (2). To the extent Counter-Claimants and the Class Members are relieved of repayment obligations for Student Loans based on violations of

applicable State law, Counter-Defendants are subject to payment of the amount of the loan to which the defense applied. 34 CFR 685.206(c)(3)

119. On or about January 27, 2016, the Federal Trade Commission filed the FTC Lawsuit. Prior thereto Counter-Claimants were not aware, and had no reason to suspect or believe, that DeVry's Breached Conditions and Covenants and Illegal Claims were false. Counter-Claimants and the Class Members were ignorant of the true facts regarding Counter-Defendants' Illegal Claims, and lacked the ability to have earlier discovered the true facts, until January 27, 2016 when the FTC Lawsuit was filed. Discovery of the true facts did not actually occur, and could not have occurred, until after any applicable statutes of limitation, including the three-year statute of limitations for consumer protection statutes and the five-year statute of limitations for fraud.

120. All of the wrongful conduct alleged herein is part of a general practice that was perpetuated and repeated during the Class Period nationwide throughout the United States, including without limitation throughout the states of Illinois, Missouri, Kansas, Georgia, and California.

121. Claimant requests that the Court: (a) enter an order declaring Counter-Defendants' conduct to be a false, misleading, and/or confusing and a willful violation of the UDTPA and applicable State laws; (b) enter an order declaring Counter-Defendants engaged in deceptive trade practices in violation of 815 ILCS 510(5), (7), (9), and (12) by, *inter alia,* deliberately misrepresenting the quality, characteristics, uses, and benefits of the Education, and actively concealing, and causing others to conceal, material information about the true nature of the Education sold by Counter-Defendants; and (c) enter such other orders or judgments as may be necessary to enjoin Counter-Defendants from continuing their unfair and deceptive business

practices, and to provide such other relief as set forth below and remedy the injury-in-fact resulting from Counter-Defendants unlawful conduct.

122.   Claimant is entitled to an award of reasonable attorneys' fees and costs under 815 ILCS 510/3 by any declaratory, injunctive, or other relief entered herein.

**SECOND CAUSE OF ACTION**
**Illinois Consumer Fraud And Deceptive Trade Practices Act**
**(815 ILCS 505, *et. seq.*)**
**(Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the Class)**

123.   Counter-Claimants, on half of themselves and other Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

124.   The ICFA, 815 ILCS 505, *et. seq.* provides that Defendant may not employ "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2.

125.   Through the means described herein above, Counter-Defendants have, without limitation, represented, expressly or by implication, in their advertising and promotional material that:  (a) as a result of obtaining a DVU degree, 90% of DVU graduates from a specific year who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (b) as a result of obtaining a DVU degree, for at least the last 10 years, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (c) one year after graduation, the average or median earnings of DVU graduates with bachelor's degrees were up to 15% higher than the average or median earnings of graduates with bachelor's degrees from all other colleges and universities; and

- 49 -

(d) DVU bachelor's degree graduates earn up to 15% more than graduates from other colleges and universities, as described in part (c) above, as a result of obtaining a bachelor's degree from DVU.

126.    Counter-Defendant intended that Counter-Claimants and the Class rely on its deceptive and practices in that their reliance induce them to purchase the Education and related products and services. Counter-Defendant's deception occurred during the marketing and sale of Counter-Defendants' Education and related products and services in the course of conduct trade and commerce. As a result of Counter-Defendant's violations of the ICFA as described herein, Counter-Claimants and the Class have been harmed and suffered actual damages and injury-in-fact caused by Counter-Defendants' deception.

127.    On or about January 27, 2016, the Federal Trade Commission filed the FTC Lawsuit. Prior thereto Counter-Claimants were not aware, and had no reason to suspect or believe, that DeVry's Breached Conditions and Covenants and Illegal Claims were false. Counter-Claimants and the Class Members were ignorant of the true facts regarding Counter-Defendants' Illegal Claims, and lacked the ability to have earlier discovered the true facts, until January 27, 2016 when the FTC Lawsuit was filed. Discovery of the true facts did not actually occur, and could not have occurred, until after any applicable statutes of limitation, including the three-year statute of limitations for violations of the ICFA and five-year statute of limitations for fraud.

128.    Counter-Claimants and Class Members are entitled to, and hereby seek, actual damages, reasonable attorneys' fees and costs, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

**THIRD CAUSE OF ACTION**

**Illinois Private Business And Vocational Schools Act**
**(105 ILCS 425/1, *et. seq.*)**
**(Against All Counter-Defendants on Behalf of Counter-Claimants Individually**
**and the Class)**

129.    Counter-Claimants, on half of themselves and other Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

130.    105 ILCS 426/85(h) provides that, "Any owner, operator, or authorized agent of a private business and vocational school who commits any of the following offenses is guilty of a Class A misdemeanor for the first offense and a Class 4 felony for the second or subsequent offense.  Knowingly and for the purpose of inducing a person to enroll in the program of study offered by the school, makes any false or misleading statements, misrepresentations, or false promises to the person regarding opportunities upon graduation from the school for (i) employment in a business, industry, or trade, (ii) admission to an institution of higher learning, or (iii) admission to an occupational licensing examination."

131.    105 ILCS 426/85(m) provides that, "Any person who suffers damages as a result of a violation of this Act committed by a school or its representative may bring an action against the school. The court, in its discretion, may award actual damages, treble actual damages if fraud is proved, injunctive relief, and any other relief that the court deems proper.  Such action may be commenced in the county where the school is located or has its principal place of business or in the county where the transaction or any substantial portion thereof occurred.  In any action brought by a person under this Section, the court may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.  Either party to an action under this Section may request a trial by jury."

- 51 -

132.    Through the means described herein above, Counter-Defendants have represented, expressly or by implication, in their advertising and promotional material that:  (a) as a result of obtaining a DVU degree, 90% of DVU graduates from a specific year who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (b) as a result of obtaining a DVU degree, for at least the last 10 years, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (c) one year after graduation, the average or median earnings of DVU graduates with bachelor's degrees were up to 15% higher than the average or median earnings of graduates with bachelor's degrees from all other colleges and universities; and (d) DVU bachelor's degree graduates earn up to 15% more than graduates from other colleges and universities, as described in part (c) above, as a result of obtaining a bachelor's degree from DVU.

133.    Each representation set forth in above is false or misleading and was not substantiated at the time the representation was made.  Therefore, the making of each representation as set forth herein above constitutes a deceptive act or practice, in violation of the VSA, 105 ILCS 425, *et seq.*

134.    Counter-Defendant knowingly and for the purpose of influencing and inducing Counter-Claimants and the Class to enroll in the Education and course of instruction offered by DeVry made false and misleading statements, misrepresentations, and false promises regarding the opportunities upon graduation from the school for employment in business, industry or trade.

135.    As a result of Counter-Defendant's violations of the ICFA as described herein, Counter-Claimants and the Class have been harmed and suffered actual damages and injury-in-fact.

136.    Counter-Claimants and Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs under, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
### (Against All Counter-Defendants on Behalf of Plaintiff Robinson Individually and the Contract Class)

137.    Counter-Claimants, on half of themselves and other Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

138.    Counter-Claimant Robinson, and each Contract Class Member, entered into the written Post-2010 Agreement and contract with DeVry.  Pursuant to the terms of the Post-2010 Agreement, DeVry agreed, amongst other obligations, to provide the Education to Counter-Claimants who in turn agreed to pay DeVry money in the form of tuition payments.

139.    In the Post-2010 Agreement, DeVry contractually represented, warranted, promised, made as a condition precedent, and covenanted that:

**Accurate Information Disclosure**

"DeVry publishes accurate information about its programs, policies, services, and graduate outcomes.  Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry."

140.    Counter-Defendants incorporated the Illegal Claims into the Post-2010 Agreement with Counter-Claimants and the Class by reference, including the 90% Placement Claim and other warranties of graduate outcomes set forth on their website, by expressly referencing such information and providing:

"For comprehensive consumer information, please visit devry.edu/studentconsumerinfo."

141.    Counter-Defendants represented, warranted, promised, covenanted, and made a condition precedent in, to, and of the Post-2010 Agreement with Counter-Claimants and the Class that:

**Career Services**

"DeVry's graduate employment statistics do not include graduates who do not actively participate in an employment search."

142.    Counter-Defendants breached their Post-2010 Agreement with Counter-Claimants and the Class Members, and each of them, in that DVU's representations, warranties, promises, conditions precedent, and the Breached Conditions and Covenants regarding the Illegal Claims in connection with the information about its programs, policies, services, and graduate outcomes provided on their website, in their catalogs, and in their advertisements and other materials published by Counter-Defendants were false, incomplete, inaccurate, deceptive, and unfair.  Had Counter-Claimants and the Class Members, and each of them, known the falsity of the Breached Conditions and Covenants and representations, warranties, promises, conditions precedent, and covenants made by Counter-Defendants in the Post-2010 Agreement, they would not have entered into the Post-2010 Agreement, would not have paid as much for the Education, if in fact they would have purchased any products and services from Counter-Defendants at all, and would not have taken out Student Loans and paid monies to Counter-Defendants.

143.    On or about January 27, 2016, the Federal Trade Commission filed the FTC Lawsuit.  Prior thereto Counter-Claimants were not aware, and had no reason to suspect or believe, that Counter-Defendants' Breached Conditions and Covenants and Illegal Claims were false. Counter-Claimants and the Class Members were ignorant of the true facts regarding Counter-Defendants' Illegal Claims, and lacked the ability to have earlier discovered the true facts, until January 27, 2016 when the FTC Lawsuit was filed.  Discovery of the true facts did not actually

- 54 -

occur, and could not have occurred, until after any applicable statutes of limitation, including the four-year statute of limitations for breach of warranty and sale of goods.

144.     Counter-Defendants breached the Post-2010 Agreement as alleged herein, and Counter-Claimants and the Class have been damaged as a direct and proximate result thereof. Counter-Claimants and the Class are entitled to actual damages in an amount to be determined in this proceeding.

## FIFTH CAUSE OF ACTION
### (Misrepresentation)
**(Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually)**

145.     Counter-Claimants and Class Members incorporate by reference the foregoing allegations.

146.     The elements of the tort of fraudulent misrepresentation are: (1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in [justifiable] reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

147.     Counter-Defendants intentionally and knowingly made the Illegal Claims which were false, untrue statements of material facts to Counter-Claimants and Class Members concerning the Education, including without limitation the 90% Placement Claim and the 15% higher income claim knowing such statements were in fact false and misleading.

148.     Counter-Defendants intentionally and knowingly misrepresented and/or suggested the aforementioned untrue or misleading facts to Counter-Claimants and Class Members with the intent to induce them to enroll and purchase the Education from Counter-Defendants.

149.     Counter-Defendants' representations are false and misleading, because: (a) the actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could

be reasonably considered "in their field" is in fact significantly and materially smaller than 90%; and (b) Counter-Defendants' own statistics showed that graduates of DVU did not have any higher income than graduates from other schools and that such claim was false, misleading, deceptive and incomplete.

150. Counter-Defendants knew that their representations were false and/or misleading when made, or made the representations and suggestions recklessly and without regard for their truth. Counter-Claimants and the Class Members have suffered damages and injury-in-fact the form of, without limitation, liability for Student Loans tuition and other payments for the Education.

151. Counter-Claimants and Class Members justifiably relied on the Illegal Claims and would not have purchased the Education or any other of Counter-Defendants' products and services, or would not have paid as much for them, had they known the truth about the Illegal Claims.

152. Neither Counter-Claimants nor the Class Members did, or could have discovered with any amount of reasonable diligence, the true facts regarding the Illegal Claims until January 27, 2016 when the FTC Lawsuit was filed. Counter-Claimants and the Class Members were ignorant of the true facts regarding Counter-Defendants' Illegal Claims, and lacked the ability to have earlier discovered the true facts, until January 27, 2016 when the FTC Lawsuit was filed. Discovery of the true facts did not actually occur, and could not have occurred, until after any applicable statutes of limitation, including the five-year statute of limitations for fraud.

153. As a direct and proximate result of Counter-Defendants' intentional misrepresentations, Counter-Claimants and Class Members have suffered injury and damages, including but not limited to, monetary loss in connection with purchases of the Education they

would not have purchased absent Counter-Defendants' false and/or misleading representations, or would not have paid as much for, and have suffered economic damages, including incurring Student Loans and paying Education related costs, expenses, and charges they would not have otherwise incurred and paid.

154. Counter-Claimants and Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs under, and any and all further equitable relief that this Court deems appropriate.

### SIXTH CAUSE OF ACTION
#### (Concealment)
**(Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually)**

155. Counter-Defendants intentionally and knowingly concealed material facts from Counter-Claimants and Class Members that were known only to Counter-Defendants prior to Counter-Claimants and Class Members' purchases of the Education and related products and services.

156. Counter-Defendants intentionally and knowingly concealed the aforementioned material facts from Counter-Claimants and Class Members with the intent to induce them to purchase the Education and related products and services from and use Education and related products and services.

157. Counter-Defendants had, and have, a duty to disclose the concealed information because Counter-Claimants and Class Members did not know of the concealed facts prior to purchasing the Education and related products and services, nor could they reasonably be expected to learn or discover such concealed facts prior thereto.

158. Neither Counter-Claimants nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding Counter-Defendants'

Illegal Claims until January 27, 2016 when the FTC Lawsuit was filed. Counter-Claimants and the Class Members were ignorant of the true facts regarding Counter-Defendants' Illegal Claims, and lacked the ability to have earlier discovered the true facts, until January 2, 2016 when the FTC Lawsuit was filed. Discovery of the true facts did not actually occur, and could not have occurred, until after any applicable statutes of limitation, including the five-year statute of limitations for concealment.

159. Counter-Claimants and Class Members would not have purchased the Education and related products and services, or would not have paid as much therefor, had they known of the concealed information.

160. Counter-Claimants and the Class justifiably relied on the facts as they knew them at the time, and as a direct and proximate result of Counter-Defendants' fraudulent concealment of material facts, Counter-Claimants and Class Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with purchases of the Education and related products and services they would not have purchased absent Counter-Defendants' concealment, fraudulent omissions. and non-disclosures, or would not have paid as much for, and have suffered economic damages, including incurring Student Loans and paying Education related costs, expenses, and charges they would not have otherwise incurred and paid.

161. Accordingly, Counter-Claimants and Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, and any and all further equitable relief that this Court deems appropriate.

### SEVENTH CAUSE OF ACTION
#### (Negligence)
#### (Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the Class)

162. In providing the Education to Counter-Claimants and the Class, Counter-Defendants owed a duty to exercise reasonable care to make full, fair, and adequate

disclosure in connection with the characteristics, uses, benefits, standards, quality, attributes, and nature of the Education. This duty included, among other things, taking reasonable measures to protect the rights of Class Members in compliance with applicable law, including, but not limited to, procedures and policies to supervise, restrict, limit, and determine the accuracy and truthfulness of their claims, materials, and advertising in connection with the Education.

163. In providing the Education to Counter-Claimants and the Class, Counter-Defendants owed a duty to exercise reasonable care regarding and when making the Illegal Claims, and representations, warranties, promises, statements, and omissions in connection with the characteristics, uses, benefits, standards, quality, attributes, and nature of the Education.

164. Counter-Defendants' advertising and promotional materials were intended to affect Counter-Claimants and the Class. Counter-Defendants were aware that by promising, warranting, representing, and covenanting that their claims, materials, and advertising about the Education were accurate, that it had a responsibility to take reasonable measures to ascertain and fully, fairly, and adequately disclose the accuracy and truthfulness thereof.

165. There is a close connection between Counter-Defendants' failure to take reasonable measures to ascertain and disclose the accuracy and truthfulness of their materials and advertising, and the injury to Counter-Claimants and the Class. Counter-Defendants failed to take measures to ensure the accuracy of their materials.

166. It was foreseeable that if Counter-Defendants did not take reasonable measures to ascertain and ensure the accuracy and truthfulness of their promises, warranties, representations, and covenants, Counter-Claimants and Members of the Class would borrow money through Student Loans to purchase the Education. Counter-Defendants should have known to take

precautions to ensure their Illegal Claims, advertising, materials, and representations were accurate.

167.     Counter-Defendants breached their duty to exercise reasonable care in connection with the accuracy of it Illegal Claims regarding the Education by: (a) failing to implement and maintain adequate measures to ensure accuracy and truthfulness; (b) failing to monitor their advertising, promotional, and other materials to identify unlawful, inaccurate, or untruthful materials; (c) allowing untruthful and inaccurate and untruthful advertising and promotional materials and claims regarding the nature of the Education to be given and made to Counter-Claimants and the Class; and (d) failing to otherwise prevent inaccurate and untruthful claims and advertising and promotional materials to be made and published.

168.     Counter-Defendants breached their duty of full, fair, and adequate disclosure about the Education. Counter-Defendants have failed to notify their current and former Students affected by the Illegal Claims. Counter-Defendants were, or should have been, aware of the Illegal Claims as early as January 1, 2008.

169.     But for Counter-Defendants' failure to implement and maintain adequate measures to ensure the accuracy of their claims and materials in connection with the Education, and their failure to monitor their policies and procedures to identify inaccurate, untruthful, and unlawful claims, Counter-Claimants and Class Members would not have taken out the Student Loans they did, would not have purchased the Education for the price they did, if in fact they would have purchased the Education from Counter-Defendants at all, and would not be at a heightened risk of being financially unable to repay, or defaulting on, their Student Loans in the future.

170.     Counter-Defendants' negligence was a substantial factor in causing harm to Counter-Claimants and Class Members. As a direct and proximate cause and result of

Counter-Claimants' failure to exercise reasonable care and use reasonable measures to ensure the accuracy of their Illegal Claims in connection with the Education, Counter-Claimants and Class Members have suffered actual injury-in-fact and economic damages, including incurring Student Loans and paying Education related costs, expenses, and charges they would not have otherwise incurred and paid.

171.     Neither Counter-Claimants nor other Class Members contributed to the unlawful conduct set forth herein, nor did they contribute to Counter-Claimants' making of the Illegal Claims, nor to the insufficient policies, procedures, and measures which were omitted and led to the failure to ensure the accuracy and truthfulness of Counter-Defendants' claims in connection with the nature of the Education.

172.     Counter-Claimants and the Class seek compensatory damages, the costs of suit and attorneys' fees, and other and further relief as is deemed just and proper as further set forth below.

### EIGHTH CAUSE OF ACTION
#### (Conversion)
#### (Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the DOE Borrower Class)

173.     Counter-Claimants, on half of themselves and other Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

174.     Counter-Claimants and the DOE Borrower Class Members are the lawful owners of the Student Loan proceeds and other monies lent to and borrowed by them in the form of Student Loans from the U.S. Treasury and administered by the federal government Department of Education (a "Student Loan").

175.     The Student Loan proceeds were paid directly to DeVry for Counter-Claimants' account and benefit.  As a result of Counter-Defendants' wrongful conduct, which includes their

collection and receipt of Student Loan proceeds paid for Counter-Claimants' and the DOE Borrower Class' benefit, Counter-Defendants have interfered with and converted Counter-Claimants' and the DOE Borrower Class' ownership interest in, or right to possess, such Student Loan proceeds.

176.    The Student Loan proceeds Counter-Defendants misappropriated are in a specific sum capable of identification. Counter-Claimants and Class Members have been damaged by Counter-Defendants' conversion.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the Class)**

177.    Counter-Claimants, on half of themselves and others Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

178.    Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and such retention is unjust. The elements of unjust enrichment may be established without reference to a separate underlying claim in tort, contract, or statute.    *HPI Health Care Servs.*, 545 N.E.2d at 679; see also *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1998) (ruling that Illinois recognizes an independent cause of action for unjust enrichment based on HPI Health Care Services).

179.    The Illinois Supreme Court recognizes unjust enrichment as an independent cause of action.  The doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies, including the equitable remedy of constructive trust and the legal actions of *assumpsit* and restitution or quasi-contract. (See 1 G. Palmer, The Law of Restitution § 1.1, at 2-4 (1978).)

To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. See *Drury v. County of McLean* (1982), 89 Ill.2d 417, 425-26; *Kenneke v. First National Bank* (1978), 65 Ill. App.3d 10, 12.

180.    In addition, where the retention of the benefit unjust is due to some improper conduct by the defendant, that improper conduct may form the basis of another claim against the defendant in tort, contract, or statute.  S*ee, e.g., Lewis v. Lead Indus. Ass'n,* 793 N.E.2d 869, 877 (Ill. App. Ct. 2003) and *Alliance Acceptance Co. v. Yale Ins. Agency,* 648 N.E.2d 971, 977 (Ill. App. Ct. 1995).

181.    Counter-Defendants have been unjustly enriched in that they sold the Education and related products and services to Counter-Claimants and the Class that did not have the attributes, quality, or value, represented, warranted, promised, and covenanted.

182.    When purchasing an Education from Counter-Defendants, Counter-Claimants and Class members reasonably believed the Education they would receive from Counter-Defendants was as represented, warranted, promised, and as advertised, and that the Illegal Claims, including without limitation the 90% Placement Claim, 15% higher income claim, and other graduate outcomes information and materials were true.

183.    Counter-Claimants and Class Members received less than what they paid for in that the Illegal Claims were not true and the DeVry Education and related products and services were not as represented, and therefore Counter-Defendants did not deliver as promised.

184.    Claimant and Class members conferred a benefit on Counter-Defendants by taking out Student Loans, purchasing, and paying a premium for the Education sold them.  Had Counter-

Claimants and Class Members known about the misrepresentations and the true placement rate and income rate, they would not have purchased the Education or any products or services from Counter-Defendants, or would have paid significantly less for them, if at all.

185.     Counter-Defendants should therefore be required to disgorge all revenues, gross income, profits, benefits, and other such consideration it obtained through their wrongful conduct.

### TENTH CAUSE OF ACTION
### (Declaratory Relief)
### (Against All Counter-Defendants on Behalf of Both Counter-Claimants Individually and the Class)

186.     Counter-Claimants, on half of themselves and others Class Members similarly situated, reallege and incorporate by reference each of the allegations contained herein.

187.     A court may make binding declarations of the construction of any statutes, and a declaration of the rights of the parties interested by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well. 735 ILCS 5/2-701.

188.     Counter-Claimants and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, their Student Loans resulting from Counter-Defendants' wrongful and unlawful conduct.   Interest on Student Loans continues to accrue every day, whether such loans are in forbearance or default or not.

189.     Counter-Claimants and the Class Member are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest.  An actual controversy and dispute between Counter-Claimants and the other Class Members and Counter-Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

190.    Counter-Claimants and the Class Members who took out Student Loans have a defense against repayment of such loans in any action to collect such loans based on any act or omission of Counter-Defendants that would give rise to a cause of action against Counter-Defendants under applicable State law.  34 CFR 685.206(c)(1) and (2).

191.    To the extent Counter-Claimants and the Class Members are relieved of repayment obligations for Student Loans based on violations of applicable State law, Counter-Defendants are subject to payment of the amount of the loan to which the defense applied.  34 CFR 685.206(c)(3)

192.    Counter-Claimants and the Class Members are therefore entitled to a declaratory judgment that Counter-Defendants' acts and omissions as alleged herein violates applicable State law, including without limitation the UDTPA, as well as such other and further relief as may follow from the entry of such a judgment.

**PRAYER FOR RELIEF**

Counter-Claimants, individually and on behalf of all others similarly situated, respectfully request the Court enter a judgment against Counter-Defendants, and grant the following relief:

A.  an order certifying an appropriate Class, designating Counter-Claimants as Class Representatives, and designating their counsel of record as Class Counsel;

B.  a declaration that the acts, omissions, and practices described in this Claim exist, are unfair, deceptive, unlawful, and a violation of applicable State law;

C.  a declaration that Counter-Defendants breached their Agreement with Counter-Claimant Robinson and the Contract Class;

D.  a declaration that Counter-Defendants owed a duty of full, fair, adequate, and truthful disclosure in connection with their Education and other educational products, services, and material;

- 65 -

E.  an award to Counter-Claimant and Class Members of compensatory, exemplary, punitive, treble, and statutory penalties and damages as allowed by law, including interest, in an amount to be proven at trial;

F.  an order permitting Counter-Claimants and Class members to elect to affirm their contracts or alternatively demand rescission and seek damages;

G.  a declaration that Counter-Defendants must disgorge for the benefit of Counter-Claimant and Class Members, all or part of the ill-gotten revenue, gross income, profits, and benefits received from the sale of the Education and/or any other products and services, and make full restitution to Counter-Claimant and Class members;

H.  restitution in the amount of monies paid by Counter-Claimant and Class members for the Education and any products and services purchased from and sold by Counter-Defendants;

I.  an order enjoining Counter-Defendants from engaging in further unfair and deceptive advertising, promotion, distribution and sales practices with respect to the Education and any educational products and services;

J.  a permanent injunction prohibiting Counter-Defendants and their officers, agents, employees and successors, from engaging in the unlawful practices complained of herein in violation of applicable State law;

K.  a mandatory injunction requiring Counter-Defendants to adopt business practices in conformity with the requirements of applicable laws;

L.  a declaration that Counter-Defendants are financially responsible for notifying all Class members about the true nature of the Education and Counter-Defendants' educational products and services;

M.  an order requiring Counter-Defendants to notify the Class that the Illegal Claims, including without limitation the 90% Placement Claim and 15% income claim are false and untrue;

- 66 -

N.  an order imposing a constructive trust upon Counter-Defendants such that their enrichment, benefit, and ill-gotten gains may be allocated and distributed equitably to and for the benefit of Counter-Claimants and the Class Members;

O.  an award of punitive and treble damages;

P.  an award of attorneys' fees and costs, including expert fees, as allowed by law;

Q.  an award of pre-judgment and post-judgment interest, as provided by law;

R.  leave to amend this Counterclaim to conform to the evidence produced at trial; and

S.  such other relief as the Court may deem just, proper, and appropriate under the circumstances.

## JURY DEMAND

Counter-Claimants hereby demand a trial by jury on all issues so triable.


Dated:  September 20, 2016

> */s/ Robert L. Teel*
> By: Robert L. Teel
> **LAW OFFICE OF ROBERT L. TEEL**
> ROBERT L. TEEL
> *lawoffice@rlteel.com*
> 207 Anthes Ave., Suite 201
> Langley, Washington 98260
> Telephone:(866) 833-5529
> Facsimile:(855) 609-6911
>
> *Attorney for Counter-Claimants and the Proposed Class*