# EXHIBIT E

JONATHAN E. NUECHTERLEIN
General Counsel
CHRISTINA V. TUSAN
Cal Bar. No. 192203; ctusan@ftc.gov
JOHN D. JACOBS
Cal. Bar No. 134154; jjacobs@ftc.gov
THOMAS J. SYTA
Cal. Bar No.116286; tsyta@ftc.gov
BARBARA CHUN
Cal. Bar No. 186907; bchun@ftc.gov
FAYE CHEN BARNOUW
Cal. Bar No. 168631; fbarnouw@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

YAN FANG
Cal Bar No. 279737; yfang@ftc.gov
SARAH E. SCHROEDER
Cal Bar No. 221528; sschroeder@ftc.gov
FEDERAL TRADE COMMISSION
901 Market St., Suite 570
San Francisco, CA 94103

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF |
| DEVRY EDUCATION GROUP INC., formerly known as DeVry Inc., a corporation; | |
| DEVRY UNIVERSITY, INC., a corporation; and | |
| DEVRY/NEW YORK INC., a corporation; | |
| Defendants. | |

1

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. § 1391 (b)(2) and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6. Defendant DeVry Education Group Inc. (DEG) is a publicly traded Delaware corporation with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. DEG was formerly known as DeVry Inc. DEG transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, with respect to the acts and practices of DeVry University, Inc. and DeVry/New York Inc. that are described

2

below, DEG dominated or controlled those acts and practices, knew of or approved those acts and practices, and/or benefitted from those acts and practices. DEG, DeVry University, Inc., and DeVry/New York Inc. are collectively referred to in this Complaint as "DeVry" or "Defendants."

7. Defendant DeVry University, Inc. (DVU), a Delaware corporation, is a subsidiary of DEG with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. DVU transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, DVU has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

8. Defendant DeVry/New York Inc. (DeVry New York), a Delaware corporation sometimes doing business as DeVry College of New York, is a subsidiary of DEG, with its principal place of business at 3005 Highland Parkway, Downers Grove, Illinois. At all times material to this Complaint, acting alone or in concert with others, DeVry New York has advertised, marketed, distributed, or sold educational products and services to consumers.

## COMMERCE

9. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## BUSINESS ACTIVITIES

### *Background*

10. DeVry operates DVU, a private, for-profit postsecondary educational institution, which currently has more than 50 campuses throughout the United States, and at times has had as many as 96 campuses. DVU also offers online classes and degree programs. DVU's predecessor, DeVry Institute of Technology, began offering bachelor's degrees in 1970. DVU comprises five colleges, as well

as a graduate school of business. More than ten majors and 40 specializations are available. Annual new-student enrollment between 2008 and 2014 ranged from approximately 29,000 to 49,000. Since 1975, more than 870,000 students have enrolled at DVU, and approximately 278,000 undergraduate students have obtained degrees from DVU.

11. DVU tuition is $609 for each credit hour for new students and $365 for each credit hour in excess of seven credit hours for continuing students. According to DEG's 2015 10-K filing with the Securities and Exchange Commission, based upon current tuition rates, a full-time student enrolled in the five-term undergraduate network systems administration associate degree program will pay total tuition of $39,585 and a full-time student enrolled in the eight-term undergraduate business administration program will pay total tuition of $75,516. Most DVU students do not attend full-time, and the total cost for a part-time student is higher than the cost for a full-time student.

12. DEG's total gross revenues between 2008 and mid-2015 exceeded $14.5 billion. DVU's gross revenues between 2008 and mid-2015 exceeded $8.6 billion.

13. In each fiscal year between and including 2011 and 2014, DVU spent over $135 million on the advertising, marketing, or other promotion of DVU's educational products and services.

### Overview

14. Through the use of English and Spanish-language advertisements and other marketing materials, and during sales pitches with prospective students, Defendants have made deceptive representations about the benefits of obtaining a degree from DVU.

15. Defendants have advertised and promoted DVU's degree programs through television commercials, DVU's website, YouTube advertisements, radio spots, brochures, print advertisements, Facebook, Twitter, sales pitches with

4

prospective students, and other advertising and promotional materials.  DeVry's target audience includes, but is not limited to, high-school students and current and former members of the military.

16.     One of the messages of Defendants' advertisements and recruitment efforts is that obtaining a degree from DVU is highly likely to result in obtaining a desirable job soon after graduating—a well-paying, career-oriented job in the student's chosen field of study.

17.     Among other methods, Defendants convey this message by representing that, as a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation.  In some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years."  In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job.  While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a percentage that is slightly less or more than 90% (*e.g.*, 87% or 92%).  As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.

18.     Defendants also have conveyed the message that DVU graduates obtain desirable jobs by representing that DVU graduates obtain jobs that pay significantly more than jobs that graduates of other colleges and universities obtain (Defendants' "higher income claim").  For example, Defendants have represented that, one year after graduation, DVU graduates with bachelor's degrees earned 15% more than graduates with bachelor's degrees from all other colleges and universities.  As explained below, this representation is false and unsubstantiated.

19.     When settling disputes with DVU students or graduates, Defendants have frequently required the settlement agreement to include a "non-disparagement clause," which prohibits the student or graduate from, *e.g.*, indirectly or directly saying, writing, or doing anything that would disparage, reflect negatively upon, or otherwise call into question Defendants' business operations, products, services, integrity, reputation, or business relations, except as may be required by law.

### *Defendants' Advertisements*

20.     To induce prospective students to purchase DVU's educational products and services, Defendants have disseminated, or caused to be disseminated, advertisements for these products and services.  Such advertisements include, but are not limited to, the attached Exhibits A through C (television advertisements), Exhibits D through I (websites), Exhibit J (YouTube video), Exhibit K (DVU brochure), and Exhibit L (print advertisements).  Since at least 2008, Defendants' advertisements have been widely disseminated throughout the United States.  Defendants have widely disseminated other advertisements containing the same or substantially similar statements and depictions to induce prospective students to purchase DVU's products and services.

### Television Advertisements

21.     Since at least 2010, Defendants have disseminated, or caused to be disseminated, numerous television advertisements that make Defendants' 90% claims, in both English and Spanish.  These advertisements have run on national broadcast, satellite, and cable channels and stations.  Examples of such advertisements include, but are not limited to, the advertisements described below. Defendants have disseminated at least some of these advertisements on DVU's YouTube channel.

22.     A copy of an advertisement that Defendants have disseminated, or caused to be disseminated, in 2013 on numerous national cable and satellite TV channels, which is titled "Graduation Present," is attached as Exhibit A.  (A

6

transcript of this advertisement is attached as Exhibit A.1.)  Defendants also made this advertisement, including a shortened version, available on the Internet on DeVry's YouTube channel.  This advertisement contains the following statements and depictions:

 a. A DVU student narrates the advertisement.  She concludes by stating: "And when I finish my degree in business, a new job at a great company—that's the graduation present I want."

 b. Immediately after the student refers to wanting a new job at a great company, an announcer states: "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months."

 c. While the announcer is speaking, the following screen appears, with people walking in the background, for approximately five seconds:



  The text in the middle of the screen reads:

   **90%** of our **grads** actively seeking employment **had careers** in 6 months

 d. The screen with the text then disappears, and the announcer then states:  "Join the 90%.  Learn how at devry.edu."

23.     A copy of another advertisement that Defendants ran on various national cable and satellite television channels, in approximately 2010, which is titled "Offer Letter," is attached as Exhibit B. (A transcript of this advertisement is attached as Exhibit B.1.) Defendants also ran this advertisement starting in 2009, and continuing for an undetermined time, on YouTube. Defendants included a link to this YouTube video on DVU's Facebook page. This advertisement contains the following statements and depictions:

a.     The advertisement depicts people in business attire taping letters extending offers of employment to a large clear wall. The following two images are screen shots taken from this advertisement as the wall is filling up:



b.     An announcer states:

> The offer letter. If you're going to college, or back to college, that's your bull's-eye. It is for DeVry University students. In fact, for more than thirty years, 90% of all graduates in the active job market had careers in their fields within six months. 90%. And all those offer letters up there, that's just for last year. DeVry University: Discover education working at devry.edu.

24.     A copy of an advertisement that Defendants have disseminated, or caused to be disseminated, at various times between October 2013 and April 2014

on numerous national cable and satellite TV channels, which Defendants titled "Roommates," is attached as Exhibit C.  (An English-language translation of this advertisement is attached as Exhibit C.1.)  This advertisement contains the following statements and depictions:

    a.    During this advertisement, the announcer states:

        En el 2012, el 90% de los graduados de DeVry University que buscaron empleo de forma activa ejercían su carrera en menos de 6 meses.  (Translation: "In 2012, 90% of graduates from DeVry University actively seeking employment had careers in less than 6 months.")

    b.    While the announcer is speaking, the following screen appears, for approximately five seconds:



    The text in the middle of the screen reads:

        el **90%** de nuestros **graduados** que buscaron empleo de forma activa **ejercían su carrera** en 6 meses.

        (This translates to mean: "90% of our grads actively seeking employment had careers in 6 months.")

<u>DVU's Website</u>

9

25.     Since at least 2008, Defendants have made their 90% claims and higher income claim on various webpages on the DVU website, at www.devry.edu. Examples of such webpages include, but are not limited to, the webpages described below.

26.     A copy of a printout of webpages, which were available starting in 2013 by clicking a link on DVU's homepage (www.devry.edu) titled "Why DeVry," is attached as Exhibit D.  This page contains the following statements and depictions:

a.     At the top of the page it states the following:

**Excellent employment results**.

Nobody wants to go to college and just be a number . . . unless they're numbers like these.  Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.

b.     Immediately below this statement, the following graphic appears:



(1)     The text that accompanies this graphic reads:

In 2012, **90**% of DeVry University **GRADS** actively seeking employment **HAD CAREERS**[1] in their field within six months of graduation.

(2)     The corresponding footnote, which is printed in a small font size at the end of the webpage attached as Exhibit D, reads:

> [1]Figure based on 2012 graduates self-reporting data to DeVry University Career Services who were employed at graduation or actively seeking employment in their field after graduation.  Does not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services.

c.     Another heading on the same webpage reads, "**An education that pays**," which is followed by the statement that "Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earning potential right from the start."

(1)     The following graphic appears immediately below this statement, on page 2 of Exhibit D:



(2)     The text that accompanies this graphic reads:

> One year after graduation, **DeVry University grads report earning 15% more** than the median earnings reported by all other bachelor's degree candidates.[3]

(3)     The corresponding footnote, which appears at the end of the
        page in a small font size reads:

> [3]Based on PayScale.com study commissioned by
> DeVry University. Data for the study was collected in
> 2012 and compared reported earnings for 2010
> graduates. 73,309 bachelor's degree graduates
> reported earnings including 620 DeVry graduates.
> Self-reported information may not reflect actual
> earnings and may not be representative of earnings of
> individuals that do not supply information. Results
> may not be statistically significant. Comparative data
> includes private not-for-profit schools, private for-
> profit schools, and public schools.

27.     A copy of a printout of one version of DVU's homepage at
www.devry.edu, which appeared beginning in 2014 and continued into 2015, is
attached as Exhibit E.  This page contains the following statements and depictions:

a.      In large bold font, on the first screen, Defendants assure visitors to
        DVU's website that they can "Count on DeVry for Career Success."

b.      Immediately below this line, the figure "90%" is printed in bold,
        extra-large font, on the left half of the screen.  On the right half of the
        screen, the following text appears:

> DeVry University helps prepare you to advance in your
> chosen career.  In 2013, 90% of DeVry University
> graduates actively seeking employment obtained careers in
> their field within six months of graduation, or were already
> employed in their field when they graduated.*

c.      Below this statement, the following text appears:

> *Based on self-reported data from bachelor's and associate
> degree graduates.  Does not include graduates not actively
> seeking employment, as determined by DeVry University
> Career Services or graduates who did not report data on
> employment status to DeVry University Career Services.

28.    DVU's website has included webpages directed at high-school students, including webpages at http://www.high-school.devry.edu.  A copy of one such webpage, which includes "Frequently Asked Questions" for parents of high-school students, is attached as Exhibit F.  This webpage appeared in at least 2014 and 2015.  The following question and answer are included on this webpage:

> **Do DeVry University graduates get good jobs?**
>
> Employers want DeVry University graduates.  More than
> 90% of our new graduates quickly land jobs in their fields of
> study within six months of graduation (<u>learn more</u>).  This is a
> true testament to the fact that DeVry University teaches what
> companies are looking for. . . .  DeVry University graduates
> leave school well-prepared to enter the workforce and begin
> contributing immediately.

29.    Clicking on the "<u>learn more</u>" link on Exhibit F leads or did lead to a landing page for the "Career Services" section of DVU's website.  A copy of one version of this Career Services webpage that appeared in at least 2015, attached as Exhibit G, includes the same "90%" statements that Defendants made on DVU's homepage as described in Paragraph 26.

30.    DVU's website also has included webpages that appeared in at least 2015 that were directed at current and former members of the armed services.  An example of one of these pages, attached as Exhibit H, contains the following statements and depictions:

**90%** DeVry University helps prepare you to advance in your chosen career. In 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their field within six months of graduation, or were already employed in their field when they graduated.*

*Based on self-reported data from bachelor's and associate degree graduates. Does not include graduates not actively seeking employment, as determined by DeVry University Career Services or graduates who did not report data on employment status to DeVry University Career Services.

31.   Another webpage, which has appeared on DVU's website since at least 2013 and is attached as Exhibit I, contains the following statement:

**Outstanding Career Services**

In addition to a relevant education and a highly respected degree, DeVry University offers invaluable career services that have helped thousands of students begin rewarding careers in their fields. The proof is the numbers. Since 1975, 265,869 undergraduate students have graduated from DeVry and 90% of those in the active job market were employed in career related positions within six months of graduation.

YouTube Advertisements

32.   At various times since at least 2009, Defendants have disseminated or caused to be disseminated video advertisements to YouTube, including videos that Defendants has uploaded to DVU's publicly available YouTube channel at https://www.youtube.com/user/TheDevryUniversity/videos. Examples of such videos include, but are not limited to, the video described below, as well as the "Graduation Present" and "Offer Letter" videos described above.

33.     A copy of an advertisement that Defendants published on DVU's YouTube channel beginning in August 2012, which Defendants titled "Career Coaching for a Career in Technology," is attached as Exhibit J.  (A transcript of this advertisement is attached as Exhibit J.1.)  This advertisement contains the following statements and depictions:

a.      The advertisement shows a DVU student, standing in front of a mirror, who states, "This is the guy ready for a great career in technology."  A screen then appears with text identical to that depicted in Paragraph 22 of this Complaint.  Bold text in the middle of the screen reads, "90% of our grads actively seeking employment had careers in 6 months."

b.      While this text appears on the screen, the announcer states:  "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months.  Learn how at devry.edu."

Brochures

34.     Defendants have disseminated or caused to be disseminated one or more brochures promoting DVU.

35.     A copy of a brochure that Defendants disseminated or caused to be disseminated to high-school students, and which Defendants made available on DVU's website since at least 2010 and continuing through early 2015, is attached as Exhibit K.  This advertisement contains the following statements:

a.      The first page inside the brochure begins with the statement
        Begin with the end in mind –
        your career

b.      Prospective students are then advised:
        Begin your journey with the ultimate goal in mind.  Not just graduating, but landing a successful career. . . .

DeVry University has been helping students do just that since
1931.  Everything we offer . . . is focused on your career
success.  Read on to learn how you can thrive at DeVry
University – and beyond.

    c.     The statistic "90%" immediately follows this statement, in a bold,
extra-large font, followed by the statement that:

For over 30 years, 90% of all DeVry graduates in the active
job market have been employed in their field of study
within six months of graduation*.

    d.     At the bottom of the page, the following sentence appears, in fine
print: "*Active job market includes those already employed prior to
graduation."

    36.    Another brochure, entitled, "Why Should I Invest in an Education,"
which Defendants disseminated or caused to be disseminated to high-school
students, and which Defendants made available on DVU's website beginning in
2015, contains the following statements and depictions:

    a.     The following statements appear at the top of page 5 of the brochure:

**It pays to earn a degree at DeVry University**

Not only can a bachelor's degree make it possible to earn more
money when you first enter the workforce, but a bachelor's
degree from DeVry University can also help you earn more
over the life of your career.

    b.     The following graphic appears immediately below this text:



**DeVry bachelor's degree graduates report earning more than other bachelor's degree holders**

+15.4%  +9.5%  +6.9%  +6.2%  +9.4%

| 1 Year | 5 Years | 10 Years | 15 Years | 20 Years |

Average earnings, all bachelor's degree graduates ▪ Average earnings, DeVry bachelor's degree graduates

Source: Based on PayScale study commissioned by DeVry. Data collected in 2012 and compared median self-reported earnings for graduates at different stages in their careers. Self-reported information may not reflect actual earnings and may not be representative of earnings of individuals who don't supply information. Results may not be statistically significant. For information on study methodology, visit devry.edu/sourceinfo.

(1)    The text above this bar graph reads:

        DeVry bachelor's degree graduates report earning more than other bachelor's degree holders.

(2)    The key beneath the graph explains that the gray bar on the left side of each pair of bars depicts the "average earnings, all bachelor's degree graduates," and that the blue bar on the right side of each pair depicts the "average earnings, DeVry bachelor's degree graduates."

(3)    The fine print under the graph reads:

        Source: Based on PayScale study commissioned by DeVry. Data collected in 2012 and compared median self-reported earnings for graduates at different stages in their careers. Self-reported information may not reflect actual earnings and may not be representative of earnings of individuals who don't supply information. Results may not be statistically significant. For information on study methodology, visit devry.edu/sourceinfo.

<u>Print Advertisements</u>

37.    Copies of two different print advertisements that Defendants disseminated or caused to be disseminated are attached as Exhibit L.  These advertisements contain the following statements and depictions:

a.    "Everything we do is focused on preparing our students for today's careers.  Our quality, real-word degrees and lifetime of career assistance can lead to exceptional employment results."

b.    Below this statement, the following graphic appears:



The text of this graphic reads:

In 2012, **90%** of **DeVry University GRADS** actively seeking employment **HAD CAREERS** in their field within six months of graduation*

c.    The phrase "Join the 90%" immediately follows this graphic.

d.    The following statement appears at the bottom of the page, in fine print:

*Figure based on 2012 graduates self-reporting data to DeVry University Career Services who were employed at graduation or actively seeking employment in their field after graduation.  Does not include master's degree graduates or graduates who were not actively seeking employment, as determined by DeVry, or who did not report data on employment status to DeVry.

38.    Defendants have disseminated, or caused to be disseminated, representations on DVU's public Twitter page at https://twitter.com/DeVryUniv. For example, on July 29, 2013, Defendants, using "@DeVryGroup," tweeted the following:

> "90% of #DeVry grads active in the job market find employment in their field of study within 6 months." @DeVryUniv president Dave Pauldine.

## Sales pitches

39.    Prospective DVU students often have two different conversations with DVU representatives—an initial call with "an appointment setter," and then a more extensive "interview" with one of DVU's "Admissions Advisors." During the course of these interactions, Defendants make statements and representations described below to induce prospective students to enroll in DVU.

40.    Since at least 2013, appointment setters, using an outline provided by Defendants, have told prospective students:  "The DeVry University difference includes outstanding career outcomes—In 2012, 90% of DeVry University grads actively seeking employment had careers in their field within six months of graduation."

41.    If an appointment is made, prospective students then speak to a DVU Admissions Advisor.  Defendants' policy is that students go through an "interview" with an Admissions Advisor before enrolling in DVU.  The "interview" typically takes place in person on a DVU campus, although sometimes the discussion takes place by telephone.  Defendants have provided DVU's Admissions Advisors with a PowerPoint slide presentation that they use during this "interview."  Defendants also have provided guidelines, including a training guide, that instructs the Admissions Advisors how to use the presentation.  When the "interview" takes place by telephone, the prospective student is directed to a

website that allows the student to walk through the slide presentation with the Admissions Advisor.

42. DVU's Admissions Advisors represent during the "interviews" with prospective students that one of the benefits of obtaining a DVU degree is that, as a result of attaining that degree, 90% of DVU graduates obtain jobs in their field soon after graduating.

    a.    For example, the training guide instructs the Admissions Advisor, after showing a prospective student a slide touting DVU's Career Services department, to tell him or her that, "[a]s a result of these types of career assistance our graduates have shown excellent career results, let's take a look at those." The prospective student is then immediately shown a slide entitled "Excellent Employment Results."

    (1)    The following is a screen shot of a version of this slide that was used in 2013:



    (2)    This screen includes, but is not limited to, the following text: In 2012, 90% of DeVry University graduates from all programs who actively sought employment had careers in their field of study within six months of graduation.

Within that same population: •83% of associate degree graduates had careers in their field •92% of bachelor's degree grads had careers in their field.

c. The guidelines that accompany the slide presentation advise the Admissions Advisor to "[r]ead the career statistics on the screen verbatim." They then instruct the Admissions Advisor to access an "employment statistics" sheet by clicking on a link. In addition, if the "interview" is conducted face-to-face, the Admissions Advisor provides a paper copy of the employment statistics sheet to the prospective student. A copy of the "Employment Statistics" sheet that was used in 2014 is attached as Exhibit M.

d. During the "interview," if a prospective student asks the Admissions Advisor, "Will DeVry help me find a job when I graduate?", the Admissions Advisor tells the prospective student that:

DeVry offers career services that include assistance with job searches, resume preparation, practice interviews, career fairs, etc. **These services are very successful, as evidenced by our employment statistics.** (Emphasis added.)

43. Defendants' Admissions Advisors also make representations during the "interview" concerning the earnings of DVU graduates.

a. The following is a screen shot of a version of a slide that was used in 2013:

b. This screen includes, but is not limited, to the following text:

> One year after graduation, DeVry University grads report earning 15% more than the median earning reported by all other bachelor's degree graduates.

c. While viewing this slide, Admissions Advisors also are instructed to ask prospects, "How do you think having a 15% higher median earning helped those students?"

### *Defendants' Substantiation for 90% Claims*

44. To substantiate their 90% claims, Defendants have relied upon files maintained by DVU's Career Services department, which consists of information DVU obtained from students and graduates, information its Career Services department maintained concerning communications with students and graduates, related information obtained by Career Service department personnel, and analysis that DVU's staff conducted of those files. These records contain information about the students' majors, graduation dates, their employment, and DVU's classifications of their employment status. Defendants used these records to calculate the 90% figure that they use in their advertisements and sales pitches.

22

45.     These student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims.  Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded.  For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU.  In fact, Defendants include the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU.  Defendants also count graduates who did not obtain jobs in their field of study.  A significant percentage of the jobs that Defendants count as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study.  Several examples of graduates from DVU's class of 2012 who did not believe they were employed in their field of study but whom Defendants nonetheless classified as "in field" include (but are not limited to):

a.     graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);

b.     a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;

c.     a graduate with a degree in business administration (health care management specialization) working as a car salesman;

d.  a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison;

e.  graduates with various degrees working as customer service representatives.

46.  Defendants also exclude certain students from the calculation who in fact were actively seeking employment.  For example, in June 2013, Defendants excluded one 2012 graduate who, prior to being classified as inactive: viewed 177 jobs leads in DVU's jobs database; had at least six job interviews in the previous two months (including two interviews eleven days before DVU classified him as inactive); sent an email to DVU's Career Services department, two weeks before being classified as inactive, in which he stated that he "wanted to let you know I've been getting more response now that I am much more actively applying to positions," and that he "had two face to face interviews a while back and now 2 Skype interviews"; attended a DVU "Career Fair" the following day; and then sent the Career Services department an email informing them that, after attending the career fair, he sent three thank you notes to companies whose representatives he had spoken to at the fair.

47.  The actual percentage of DVU graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is significantly smaller than 90%.

### Defendants' Substantiation for Higher-Income Claim

48.  To substantiate Defendants' higher-income claim, Defendants have relied upon a report and summary information ("income report") that Defendants received from a third-party company in 2012.  This income report, relating to income data the company had received from people who had graduated from DVU and other schools in 2010, does not provide a reasonable basis to substantiate Defendants' higher-income claim.  Among other reasons, the income report is

insufficient because DVU had good cause to question, and did question, the reliability of the conclusions and information contained in the income report.

49.     The sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report.  In fact, DVU personnel expressed concerns over whether the data sufficiently supported the higher-income claim.  Among other problems, the comparison of the incomes of DVU graduates with incomes of graduates from other schools did not account or adjust for significant salary drivers such as age, experience, and degree field.  In addition, statistics that DVU had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year.

50.     Defendants not only had extensive information in their own files about the income of DVU graduates, but they also had ready access to publicly available data reflecting the incomes of graduates of schools throughout the United States, by school and by field.  Comparing the information in Defendants' own files with publicly available income data shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined, casting doubt on Defendants' higher-income claim.  Defendants' reliance on the third-party data for its higher-income claim was therefore unreasonable.

## VIOLATIONS OF THE FTC ACT

51.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

52.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I**

53.     Through the means described in Paragraphs 14 through 42,
Defendants have represented, expressly or by implication, that:

    a.     As a result of obtaining a DVU degree, 90% of DVU graduates from a
specific year (e.g., graduates from 2012) who were actively seeking
employment landed or obtained new jobs in their field of study within
six months of graduation.

    b.     As a result of obtaining a DVU degree, for at least the last 30 years,
90% of DVU graduates who were actively seeking employment
landed or obtained new jobs in their field of study within six months
of graduation.

54.     Each representation set forth in Paragraph 53 is false or misleading or
was not substantiated at the time the representation was made.

55.     Therefore, the making of each representation as set forth in Paragraph
53 of this Complaint constitutes a deceptive act or practice, in or affecting
commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

56.     Through the means described in Paragraphs 14 through 18, 25 through
26, 36, 39, 41 and 43, Defendants have represented, expressly or by implication,
that:

    a.     one year after graduation, the average or median earnings of DVU
graduates with bachelor's degrees were 15% higher than the average
or median earnings of graduates with bachelor's degrees from all
other colleges and universities; and

    b.     DVU bachelor's degree graduates earn 15% more than graduates from
other colleges and universities, as described in part "a" above, as a
result of obtaining a bachelor's degree from DVU.

57.     Each representation set forth in Paragraph 56 is false or misleading or was not substantiated at the time the representation was made.

58.     Therefore, the making of each representation as set forth in Paragraph 56 of this Complaint constitutes a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

59.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

60.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Jonathan E. Nuechterlein
General Counsel

Dated: 1-27-16

Christina V. Tusan
John D. Jacobs
Thomas J. Syta
Barbara Chun
Faye Chen Barnouw
Yan Fang
Sarah E. Schroeder
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION